842 A.2d 215 (2004)
367 N.J. Super. 76
NEW JERSEY DIVISION OF YOUTH AND FAMILY SERVICES, Plaintiff-Appellant,
v.
C.S. and J.G., Defendants-Respondents,
In the Matter of the Guardianship of M.S., A minor.
Superior Court of New Jersey, Appellate Division.
Submitted September 22, 2003.
Decided February 20, 2004.
*218 Peter C. Harvey, Attorney General, attorney for appellant (Andrea M. Silkowitz, Assistant Attorney General, of counsel; Jane S. Blank, Deputy Attorney General, on the brief).
Yvonne Smith Segars, Public Defender, attorney for respondent C.S. (Alan I. Smith, Designated Counsel, of counsel and on the brief).
Yvonne Smith Segars, Public Defender, attorney for respondent J.G. (Harold Hoffman, Designated Counsel, of counsel and on the brief).
*219 Yvonne Smith Segars, Public Defender, attorney for respondent M.S., a minor (James A. Louis, Deputy Public Defender, of counsel; Cynthia McCulloch DiLeo, Designated Counsel, on the brief).
Before Judges WEFING, COLLESTER and FUENTES. *216
*217 The opinion of the court was delivered by COLLESTER, J.A.D.

I.
The central figure of this appeal is a little girl with the initials M.S. The Division of Youth and Family Services (DYFS) appeals from a December 26, 2002 order of the Family Part denying guardianship of the child. M.S. was born on April 24, 2000, delivered by a Lodi police officer in a trailer where her twenty-one year old mother, C.S., was temporarily living. M.S. and C.S. were taken to Hackensack Medical Center. After C.S. told a hospital social worker that she smoked marijuana during her pregnancy, both C.S. and her infant daughter were drug tested for marijuana. The test results were positive for both mother and daughter.
The hospital social worker notified DYFS, and caseworker Jean Hill responded the same day. C.S. told Ms. Hill that she took "a couple of puffs" of marijuana on her birthday two weeks before M.S. was born. C.S. said she used marijuana during her pregnancy to control nausea. That statement was later confirmed by J.G., the baby's father. C.S. also told Ms. Hill that she did not seek medical advice during her pregnancy, except for two occasions when she went to a Planned Parenthood office.
At the time she gave birth, C.S. was homeless. She lived in her father's apartment in Lodi until he moved to Paterson with his girlfriend and her children. C.S.'s mother had moved to Missouri in September 1999.
C.S. told Ms. Hill that in the last month of her pregnancy she lived in a car belonging to J.G., the birth father of M.S. A week before the birth, C.S. and J.G. moved into the Lodi trailer park at the invitation of a man named Kevin whom C.S. had known for about a week. It was there that M.S. was born. At first C.S. denied any domestic violence in her relationship with J.G., but she later stated that J.G. beat her practically every day during her pregnancy and made her smoke marijuana. Nonetheless, she continued living with J.G. and never sought a domestic violence restraining order.
Ms. Hill met J.G. at the hospital the day after M.S.'s birth. J.G. said he was unemployed and homeless. He admitted that he and C.S. smoked marijuana on a regular basis, but he claimed he stopped after a recent arrest. He offered no placement plan for his daughter.
C.S. told Ms. Hill that her plan was to leave the hospital with her baby and return to the trailer park to live temporarily with Kevin. She later asked DYFS to approve an arrangement for her to live with her daughter at the apartment in Paterson where her father lived with his girlfriend. DYFS found the proposed placement inappropriate because of past involvement with the girlfriend. When asked about other relatives, C.S. told Ms. Hill that her mother lived in Missouri and that she had two sisters, one in Missouri and the other in Massachusetts. C.S. told Ms. Hill that she wished to remain with her child in New Jersey.
On April 27, 2000, three days after she gave birth, C.S. was discharged from Hackensack Medical Center. Because of unstable housing, the history of domestic *220 violence, drug use by C.S. and the lack of prenatal care, a hospital hold was placed on M.S. Meanwhile C.S. returned to the trailer park and stayed with friends. An order to show cause was signed by a Family Part judge on April 28, 2000, placing M.S. in the custody of DYFS pursuant to N.J.S.A. 9:6-8.21 pending the return date. On May 3, 2000, the court-ordered custody of M.S. was continued with DYFS pending placement. An attorney was appointed for C.S., and a law guardian was selected for the child. DYFS's permanency plan was to reunite M.S. with C.S. In support of this plan, the child was transferred from the Warren County foster home where she had been placed following her release from the hospital to a Bergen County foster home in order to provide C.S. easier access for visitation with her daughter.
On the return date of May 3, 2000, the court directed C.S. submit to a psychological evaluation, attend an out-patient drug program and complete a parenting skills program administered by the American Red Cross. C.S. was granted weekly supervised visitation. DYFS was directed to make an interstate referral to Missouri in order to evaluate the home of C.S.'s mother as a back-up placement.
J.G. did not appear on the return date. An attorney was appointed to represent him. He was ordered to submit to a paternity test, comply with drug and psychological evaluations and attend parenting skills sessions. The results of the paternity test confirmed that J.G. was the birth father of M.S., and J.G. did not dispute the result. He told the assigned DYFS worker that he was "trusting the State to take good care of [M.S.]." At no time did J.G. suggest any permanency plan for his daughter.
One month after the birth of M.S., DYFS made arrangements for C.S. to reside at Project Peace, a structured home environment in Montclair for women to live with their children. The home provided childcare in order for residents to meet their work and program obligations. The plan was for C.S. to live at Project Peace and begin compliance with court-ordered services while awaiting the next court date to unite her with M.S. Supervised weekly visitation was to continue in the interim.
Initially, C.S. followed the plan. She moved into Project Peace on May 26, 2000. She attended the first of two sessions for the mandated psychological evaluation. She also began attending Options, an out-patient drug treatment program she selected in Paterson. DYFS gave C.S. a monthly bus pass to defray transportation costs to Options and for visitation with M.S.
Unfortunately, these arrangements were short-lived. C.S. walked out of Project Peace after a week following an argument with a staff member about adhering to the house rule prohibiting locked doors. C.S. later testified that she locked her door because items had been stolen from her. She returned to Lodi but later called Project Peace to ask if she could return. Her request was denied. Again she was homeless. She moved into a trailer in Moonachie with a former boyfriend and his mother until she was told to leave. She then went to live with a girlfriend and her three children. On June 6, 2000, C.S. and her father had visitation with M.S. It would be the last time she would see her child for two years.
On June 9, 2000, C.S. was discharged from Options because of "consistent non-compliance with attendance policies." During her month in the program, C.S. tested positive for marijuana. She later testified the result must have been residual to her "couple of puffs" two weeks before M.S. was born. She also said that the setting of the program was "scary," and *221 she felt out of place since the group participants were heroin and cocaine addicts. She also said that J.G. was stalking her near the program site in Paterson.
C.S. failed to attend either the parenting program specified by the court or recommended domestic violence counseling. She said that she could not attend because her bus pass had been stolen, but she did not ask DYFS for a replacement pass.
It is undisputed that C.S. did not tell DYFS she had been terminated from Project Peace and Options. The agency first became aware on June 19, 2000, when a volunteer scheduled to drive C.S. to Options was told by a representative of Project Peace that C.S. had been discharged for non-cooperation. On the same day, C.S.'s DYFS worker received a call from a woman who said that C.S. had been staying with her and her son in Moonachie and that she had "kicked C.S. out." C.S. called DYFS the following day to cancel her scheduled visitation because she had "pink eye." She told her DYFS worker that she was staying with friends but did not know the address or the phone number.
The next day, June 21, 2000, neither C.S. nor J.G. appeared at a scheduled court review hearing. The judge was advised that C.S.'s father had moved from New Jersey and was now living in Missouri with C.S.'s mother. DYFS was directed to investigate that home for possible placement of M.S. Meanwhile, DYFS continued its efforts to locate C.S. Family Specialist Melena Anderson called C.S.'s mother in Missouri, who said she had no idea where her daughter was living. Ms. Anderson then initiated a search for C.S. through the DYFS Permanency Support Unit, but C.S. could not be found.
On July 10, 2000, C.S. called Melena Anderson at DYFS to report she found a job and was living in an apartment. However, she declined to give Ms. Anderson the phone number or the address. Ms. Anderson told C.S. that her parents were worried about her and that disappearing was not going to help her reunite with M.S. Ms. Anderson also offered to arrange visitation with M.S. the following day if C.S. called the next morning. C.S. did not call.
After both C.S. and J.G. failed to attend the August 2, 2002, compliance hearing, the Family Part judge suspended their visitation because of their failure to comply with court-ordered services and attend court hearings. At this hearing the court learned that the Missouri home study of C.S.'s parents concluded on July 27, 2000, with a recommendation that M.S. be placed with her maternal grandparents on condition that M.S. be made a ward of the New Jersey Family Court for one year and that C.S. be permitted to join the household only if she successfully completed substance abuse treatment.
DYFS objected to any placement with the maternal grandparents because it discovered that C.S.'s mother had a lengthy history with the agency, which included physical and mental abuse of C.S. and her two sisters, the denial of family crisis assistance and the rejection of counseling services. Of particular concern was the information that although C.S. and another sister had been sexually molested as children, the parents rejected offers of therapy for them. According to DYFS, C.S.'s mother did not disclose any of this information when the home study was conducted in Missouri. Moreover, at that hearing the attorney for C.S. advised the judge that C.S. was adamantly opposed to placement of M.S. with her mother because of her "horrible childhood," which included repeated beatings by her mother. As a result, no action was taken by the court to place M.S. in Missouri.
*222 Ms. Anderson continued her efforts to locate C.S., sending letters to her last reported address at the Lodi trailer park. One of the letters informed C.S. of a review of the case to be held at the DYFS regional office on September 25, 2000. C.S. appeared at the DYFS office on that date with a person she introduced as her new boyfriend. She told Ms. Anderson she was living with friends at the trailer park where she could receive mail but could not take phone calls. She said she was working at a pet store named Pet Pourri in the Garden State Plaza in Paramus. At the trial Ms. Anderson related the balance of her conversation with C.S. as follows:
I asked her why she hadn't been in touch with myself or anyone at the Division. She stated that she had things to take care of, that she needed to do by herself ... She said she loved her daughter and wanted to see her. I asked her if she was interested in surrendering the baby. She said no that she wasn't and she wanted the baby to go to her mother because at least then she could hear her daughter over the phone when she calls her mother.
I informed her that the attorney had represented at the last court hearing on August 2, that ... she, in fact, didn't want the baby to go with her mother at that time; that she told her attorney and her attorney had represented to the court that she had had a horrible childhood as a result of her mother and was physically abused by her mother.
She said she never said that but she that she didn't want her daughter in Missouri because she didn't want to be away from her butat that time she changed her mind and thought it was a good idea.
Ms. Anderson told C.S. that her visitation had been suspended by the court because of her failure to attend court-ordered programs and complete her psychological evaluation. C.S. agreed to cooperate in the future. Before she left the DYFS office, C.S. submitted to a drug test at the request of Ms. Anderson. The result was positive for marijuana.
After C.S. left the DYFS office on September 25, 2000, Ms. Anderson again made arrangements for C.S. to attend a drug counseling program, a parenting skills program and to complete the psychological evaluation. She sent letters confirming these arrangements and appointments to C.S. by certified and regular mail to the address given by C.S. at the Lodi trailer park. Although the certified letters were returned as unclaimed, the regular mail was not returned. Ms. Anderson called for C.S. at Pet Pourri and was told that no such person worked there. C.S. did not keep any of the scheduled appointments or attend any of the mandated programs.
Ms. Anderson next heard from C.S. a month later when she called on October 23, 2000. Ms. Anderson recalled the phone conversation as follows:
[C.S.] said she had to talk to me about what was going on. And I quote, "Because by all things that are right on heaven and earth, I can't understand why you are working so hard to keep [M.S.] from her family."
She asked me why I couldn't put the baby with her mother and father. I explained to her that there was a problem with her mother and father as caregivers for [M.S.] as they have a long history with the Division. She stated, "But that happened years ago." And I said to her that the issues regarding abuse [were] involved in her home growing up [were] very real and relevant to [M.S.] insofar as the Division would feel she would be at risk in the home ... *223 She stated that if the Division would just give them the baby, meaning her mother and father, that she would go out to Missouri and take care of her and that they wouldn't be as responsible for her.
I told her that I was concerned that she was not able to take care of the baby because she's not able to take care of herself. She stated that she would have food for the baby and clothes and shelter, that other people would provide for her and the child.
I questioned how solid this plan was and told her that I questioned her commitment to the child as she had not called me for one month. And since the last time I spoke to her, she missed an appointment with the psychologist.
I told her ... that I had written a letter to her explaining all that she needed to do to satisfy the court order, and she told me that she never received the letter. And I told her that I had sent it to the address that she gave me and that if she moved she should have called me to tell me that. She stated that she was still living at 56 Center Row but that she's not staying there. I told her that I don't understand that and, if we able to communicate, that she would let me know how to get in touch with her.... I told her that I tried to call her at her job but they had never heard of her. She stated that was because she worked there under a fake name. I questioned this and she said that she had her reasons. I asked her if she was still working there. She said no. She was looking for another job.
....
I asked her to call [the psychologist] and set up an appointment as I had already done that for her and had to cancel because she hadn't called to confirm. I asked her to call the American Red Cross and set up classes. I asked her to write down the number. She stated she would get the number on her own and she didn't need it. I asked her to engage in out-patient treatment. She stated, "We'll see about that. I'm not going to your little program." I told her that she could find one for herself. As long as it fit the criteria of what the court wanted that there should be no problem.
I found her to be difficult and not forthcoming. I asked her if she still wanted to meet the following day. She stated that didn't think it was necessary as she said everything that she wanted to say and didn't think that she'd be able to change the worker's mind regarding the placement of [M.S.].
C.S. appeared in court a week later at the November 1, 2000, compliance hearing. The Family Part judge continued the suspension of visitation until C.S. was "fully compliant" with all services and evaluations. DYFS was also ordered to conduct a home evaluation in Massachusetts of M.B., C.S.'s sister and M.S.'s maternal aunt.
Before leaving the courtroom, C.S. was given a new appointment to complete her psychological evaluation. She called Ms. Anderson five days later to say that she wished to go back to the out-patient drug program. She came to the DYFS office that afternoon and picked up another monthly bus pass. She told Ms. Anderson she was leaving the trailer park and gave her a new contact phone number at the home of her boyfriend's parents. Ms. Anderson reminded C.S. of the necessity of attending drug counseling, domestic violence counseling, parenting classes and keeping her appointment for the psychological evaluation to be reunited with her daughter.
On November 17, Ms. Anderson received a phone message from C.S. that it was important she speak with her. Ms. *224 Anderson called the phone number left by C.S. twice and left messages with two different people for C.S. to return the call. No return call was received. C .S. did not appear at the psychologist's office for her scheduled appointment to complete the evaluation. She also failed to attend any programs ordered by the court. C.S. later testified that she did not comply with the directions of the court because she had made plans to move to Missouri.
In December 2000, C.S. left New Jersey for Missouri without notifying DYFS, the Family Court or her attorney. She later testified that between January and March 2001, she called DYFS weekly to report and check on M.S., but DYFS records do not indicate any such calls. C.S. said she spoke to DYFS worker Judy Rocha in January 2001, to explain her situation. Ms. Rocha testified she had no conversation with C.S. until late March 2001.
Meanwhile, pursuant to prior orders of the Family Court, a supplemental home study was completed of the maternal grandparents by the Missouri social agency. C.S.'s mother was asked why she had failed to mention her prior DYFS contacts, and she responded that she must have misunderstood the question during her first interview. Although C.S. had by that time moved to Missouri and was living with her parents, C.S.'s mother never mentioned it to the evaluator because, "He never asked me." When asked about M.B., her daughter living in Massachusetts, she said they did not have a relationship. She opposed any placement of M.S. because she believed M.B. would prevent her from seeing her granddaughter out of spite.
The Missouri social worker found that a placement with C.S.'s parents was appropriate only on a conditional basis as opposed to a permanent placement. He wrote:
I would recommend the Court consider placement of [M.S.] with [E. and J.S.]. However, due to the New Jersey DYFS concerns about [their] past history with the Division, I believe that his placement should be a "Relative (Grandparent) Foster Care Placement" in accordance with the Interstate Compact versus an "Adoption Placement". In addition, I would recommend that M.S. either remain a Ward of the Superior Court of New Jersey, Chancery DivisionFamily Part, for a minimum of one year after placement to ensure her stability, or the Circuit Court of Audrain County, Missouri, Juvenile Division, and the Missouri Division of Family Services be contacted regarding accepting transfer of this case via the Interstate Compact. This would allow the Missouri DFS and Audrain County Juvenile Office to closely monitor M.S.'s placement and would facilitate her removal and placement in foster care, if the [grandparents] fail to comply with the Division's services and recommendations.
Coincidentally, on January 16, 2001, the same day the Missouri report was sent to the Family Court in New Jersey, the Massachusetts Department of Social Services submitted its report recommending placement of M.S. with M.B., the maternal aunt of M.S. and a single mother of a two-year old boy living in a Boston suburb. The report recommended a permanent placement.
It is our recommendation that M.B. be approved for the placement of her niece M.S. Her home meets all the standards of the ... regulations in regard to space and safety. Her references have given glowing recommendations and M.B. has a large support network in her church community and friends. She is a young woman who had had to endure many hardships throughout her young life and *225 she has managed to do so with the help of therapy and spiritual support. She has to date done a wonderful job raising her own biological son and another child will transition into her home easily as she has prepared her son as much as one can with a 2 an 1/2 year old.
At the January 17, 2001, compliance review hearing, DYFS recommended to the Family Court judge that M.S. not be placed with her Missouri grandparents because the recommended placement was not permanent and because of the documented prior history of family abuse. DYFS recommended instead that M.S. be placed with M.B. in Massachusetts. J.G. was present at this hearing and did not object to the recommended placement. C.S. was not present, and her whereabouts were unknown to both DYFS and the court.
The Family Part judge accepted the DYFS recommendation and ordered that the placement with M.B. be self-executing on approval by the law guardian and receipt of the requisite waiver for an out-of-state child placement. Both of these conditions were met, and M.S. was placed in the home of her maternal aunt on March 9, 2001. She was ten and one-half months old. It was her third foster placement after her discharge from Hackensack Medical Center when she was four days old.
On March 26, 2001, C.S. called the DYFS office. Ms. Rocha testified that this was the first time she learned that C.S. had moved to Missouri three and one-half months earlier. When Ms. Rocha asked C.S. why she had not called before, C.S. responded that her parents forbade her to do so. Ms. Rocha said C.S. was surprised to learn that M.S. had been placed with her sister. When she was told that her parents had been previously advised of the placement, C.S. said her mother had not told her.
During that conversation, C.S. told Ms. Rocha she had recently moved from her parents' house into her own apartment, was working at a local Quik-Stop and was engaged to be married. She gave Ms. Rocha an address and phone number. Ms. Rocha called back the next day to give C.S. the name and address of her attorney, and she told C.S. to call or write the Family Part judge to communicate her intentions regarding custody of M.S. Ms. Rocha testified that after that conversation, she did not hear from C.S. for another four months. She made several calls, but there was never an answer. In July Ms. Rocha discovered that the phone was disconnected.
In the meantime, DYFS requested M.B. consider adopting M.S. since there was no plan of reunification of the child with either birth parent, and neither parent had seen their daughter for over a year. When M.B. agreed, DYFS filed a guardianship complaint on June 11, 2001, seeking to terminate the parental rights of C.S. and J.G. in order to free M.S. for adoption by M.B.
The next contact between C.S. and DYFS occurred on August 3, 2001, when C.S. placed a call from her mother's house and left a message. Ten days later her father called DYFS to report that C.S. had a job and had moved from her parent's house. He provided a new address.
C.S. opposed the guardianship proceeding by DYFS. She returned to New Jersey in May 2002, and submitted to psychological and bonding evaluations. The judge ordered supervised visitation with M.S. on May 15, and M.B. brought the child from Massachusetts to New Jersey for that purpose. It was C.S.'s first contact with her daughter since June 6, 2000. Subsequently six more supervised visits were held in New Jersey, followed by extended weekend visitations in Massachusetts.
*226 At the guardianship trial C.S. testified she lived in Mexico, Missouri with her husband, D.D., whom she married on March 15, 2002. She said she loved her daughter and wanted to be a mother to her. She asked that M.S. be permitted to live with her and her husband in their home near her parents and her other half-sister.
C.S. claimed she received little support from DYFS before leaving for Missouri. She denied that she was unavailable to her DYFS caseworker and blamed DYFS for the suspension of her visitation because "nobody bothered to take my side." She maintained that she never intended to abandon her child by moving to Missouri. Rather, she said that her life prior to her leaving New Jersey was "too much of a mess" and that she left to live with her mother in order to stabilize herself.
I was already cut off from my visitation. There waswhatwhat was important to me at that time was to just get my life together, to be some place where I had moral support, where I had my family, where I had love, where I had a steady place to live, I could find a steady job. Things were really cheap out there... I just wanted to get there, stabilize my life and get my daughter home and that wasand that was my plan. That's what I started doing the second I got into Missouri.
C.S. testified she did stabilize her life in Missouri. After staying with her parents for a short time, she got her own apartment as well as a job babysitting young children. She attended psychological counseling and completed a parenting program. She also completed an out-patient drug program and followed up by attending Narcotics Anonymous (N.A.). It was at an N.A. meeting that C.S. met D.D., a divorced father of two children. D.D. testified he fully supported his wife's efforts to have C.S. live with them. He said they were preparing their apartment as a home for M.S.
Certain contradictions were noted in C.S.'s testimony at the guardianship hearing. She described her childhood as "happy." However, the DYFS records indicated that she was physically and emotionally abused by her mother and sexually abused by the landlord of the premises where she and her parents lived. According to the records, C.S.'s mother declined therapy for C.S. after the sexual assault of her daughter despite the obvious trauma she suffered. As a teenager she attempted suicide twice. She was also committed to a psychiatric hospital. When C.S.'s mother testified, she denied she was told by C.S. of her sexual abuse or of any suicide attempt. She also denied ever beating any of her daughters.
Despite protestations by both C.S. and her mother of a good relationship, records produced at trial indicate their relationship was highly conflicted and confrontational through C.S.'s early adult years. On October 13, 1998, C.S.'s mother was granted a final domestic violence restraining order against C.S. based on verbal threats and physical assaults. C.S.'s mother certified in the complaint that C.S. threw a lamp and phone book at her, kicked her, threw her on the floor and slapped her in the face after telling her, "Now you'll see what is like to get punched." C.S.'s mother later called police in May 1999, to report that C.S. violated the order. After C.S.'s mother agreed to a dismissal of the 1998 restraining order on July 2, 1999, C.S. returned to live with her. However, four days later C.S.'s mother signed another domestic violence complaint alleging further violent acts by C.S. and claiming her safety was at risk if her daughter lived with her. C.S.'s mother obtained a permanent restraining order against her *227 daughter, which continued in effect until she moved to Missouri.
The testimony of M.B., C.S.'s older sister, was also in conflict to the claim of a stable, happy childhood home for herself and her sisters. She described that home as neglectful, physically abusive and dangerous. She said her mother beat her regularly, threw her out of the house on many occasions and forced her to work until 11:00 p.m. when she was thirteen. She said that when she was a child, she was sexually assaulted for a year and a half by a family friend, whom her mother defended and from whom her mother accepted money. She explained that intense therapy helped her deal with her childhood trauma. She stated she did not have a relationship with her mother and did not want one.
M.B. testified her first involvement with this matter occurred when she received a letter from her mother telling her C.S. was pregnant, needed help and suggested she call her step-father. M.B. made the call, and her step-father asked if she would take in both C .S. and the child. She declined. Later she was called by her step-father shortly after M.S.'s birth. He told her that because C.S. had smoked marijuana during her pregnancy, the State might try to take the baby away from her.
In September 2001, M.B. received a letter from DYFS asking if she was willing and able to take in M.S. with the possibility of a permanent placement. M.B. called to say she was willing to do so. M.B. was also told that DYFS was considering placement of M.S. in Missouri with J.S., and M.B. expressed concerns about that option because of her childhood experiences. She agreed to accept M.S. in her home on a relative foster placement. She specifically stated that her decision was not based on any animus toward her mother. She also said that she loved C.S.
M.B. testified that when M.S. came to live with her at ten months old in March 2000, she was "tense, scared and angry." She said M.S. gradually relaxed and accepted M.B.'s home as her own and M.B.'s son as her brother. When asked why she wished to adopt M.S., M.B. replied,
Well, I love her. She's part of our family. She sees me as her momma. And she has a place. You know, she deserves this life that she has. And she deserves to be safe and happy. And I'm giving her that.
M.B. also testified that if she was permitted to adopt M.S., she would seek no financial assistance from the State. She also stated that she would continue to permit visitation and foster a relationship between her sister and M.S. including reinforcing M.S.'s knowledge that C.S. was her birth mother. She stated,
There are pictures of [C.S] as a child. There are pictures of [C.S.] and me at my home.... [M.S.] knows who she is. And, of course, I mean, its part of our life. She's my sister. She's not going to stop being my sister and so, yes, I mean, of course, I'm going to continue to facilitate [M.S.'s] understanding of ... who she is.
M.B. said that if C.S. remained in Missouri, she would facilitate extended visitation with M.S.
And I said to [C.S.] that, you know, and we talked very specifically about how we could work this out. By that I said, in the future, "When she's able to get on a plane by herself, I imagined she'd spend her summers or part of her summers with you." And I said to her now, you know, if she has a relationship with our mother, you know that's fine ... but as it relates to me ... I will not be *228 forced to have a relationship with my mother.
[M.S.] understands that [C.S.] is her birth momma. That she grew in [C.S.]'s belly. She understands that.
Q. You told her that?
A. Oh, we talk about it all the time. She talks about it with her teacher. She understands it with her friends. She understands that [C.S.] is her birth momma and that I am the momma who takes care of her. She can say it back to you.
And I said to [C.S.] that ... I explained and my understanding of an open adoption being that there's one party who cares for the childthat would be me and there is a relationship facilitated between the child and the birth parent specifically so that they don't have that loss of identity and that wondering, and "why was I abandoned" ...
Neither C.S. or J.G. contested that M.S. was happy and thriving in the home of M.B.
Three psychologists testified at the guardianship trial. Dr. Ernesto L. Perdomo, Ph.D., testified on behalf of DYFS that he evaluated J.G. on January 23 and 24, 2002, and concluded that he could not provide a stable home for his daughter due to the lack of stability and organization in his own life. J.G. produced no testimony to challenge the evaluation and conclusion.[1]
Dr. Frank J. Dyer, Ph.D., testified he was retained by DYFS to assess the ability of C.S. to parent M.S. He reviewed the DYFS material supplied to him and conducted a clinical interview on February 11, 2002. He found C.S. to be evasive during the interview.C.S. described her childhood and relationship with her mother as problem-free despite the history of sexual and physical abuse and a suicide attempt. She also admitted that she had been arrested for attempting to hit her mother with a lamp and for violating a restraining order obtained by her mother. When asked about being abused during her pregnancy by J.G., C.S. told Dr. Dyer that she did not seek medical attention because she did not want to get J.G. in trouble. Dr. Dyer asked C.S. why she lost contact with DYFS for such a substantial period of time after her move to Missouri and she responded that she could not find a pay phone.
Dr. Dyer found that C.S. lacked maturity and judgment beyond that of an adolescent and manifested an inability to take responsibility for her own actions. He was concerned that C.S. placed a higher value on escaping detection than considering a risk to her child. He said this tendency to avoid responsibility and evade detection was "the feature of this clinical profile that is of most concern to me, especially in view of the fact that [C.S.] proposes to take [M.S.] out to Missouri where DYFS would not have the opportunity to supervise her."
Dr. Dyer also testified that C.S. did not comprehend that M.S. would experience a traumatic loss if she was removed from M.B.'s home. He discerned that if C.S. was awarded custody and M.S. expressed *229 feelings of loss or exhibited loyalty toward M.B., C.S. would be very likely to respond inappropriately and without comprehension of the child's feelings or needs. Dr. Dyer opined that due to C.S.'s resistance to intervention, including refusal of services provided by DYFS and the Family Court, her deceptiveness witnessed by her denial of childhood problems, and what he termed her "narcissistic preoccupation," her prognosis to change and become an appropriate parent for C.S. was poor.
Dr. Dyer further testified that M.S. was substantially bonded with M.B. He observed the child to be happy, emotionally secure and relaxed with her aunt, whom she calls "momma." He found that M.B. provided sufficient structure and had a well-developed support system for raising M.S. with her own son. Her employer was understanding and permitted her to take time off for the children. She also belonged to a cooperative day-care facility and she was actively involved with her church.
In contrast, Dr. Dyer concluded after observing C.S. and the child that M.S. views her birth mother "as in some vague way ... some kind of threat to her stability and security." He opined that he did not see it possible for C.S. to develop a relationship with M.S. that would approximate an attachment relationship or a bond such as that which M.S. had with M.B.
He testified that M.S. would suffer severe and enduring harm if she were removed from her aunt in the middle of a developmental period in which she is very vulnerable. He feared that uprooting M.S. and transferring custody to the mother would impair the child's self-esteem, basic trust and capacity to form intimate emotional ties. He elaborated that if M.S. was separated from M.B., the child's central love object, M.S. would perceive herself as intrinsically unlovable and would be scarred in terms of trusting other people. He opined that such a disturbance in the attachment relationship could carry over into adolescence and adulthood with a risk of severe personality disorder. Therefore, he strongly recommended that M.B. be permitted to adopt M.S.
Dr. Ronald G. Silikowitz, Ph.D., testified on behalf of C.S. He conducted a psychological examination of C.S. and observed her interaction with M.B. He said he was impressed by her openness, her remorse for her past mistakes in her life and the "remarkable" changes she made in her lifestyle. He said she was able to parent M.S. since she was now married, had her own home, had completed parenting classes, was involved in therapy and was drug free.
During his evaluation, Dr. Silikowitz made no inquiry as to the reasons C.S. left New Jersey and moved away from her daughter to Missouri, leaving the child in a foster home with non-relatives. He did not inquire into C.S.'s relationship with her husband other than to accept her statements that she was happy.
Based on his observations of M.S., Dr. Silikowitz found that the child had a difficult time with change, "more so than any child I've seen in the last twenty years." He attributed his finding to the multiple placements M.S. experienced in her young life, emphasizing that every child needs a sense of permanence. Accordingly, he believed that a change in custody would "most certainly" cause harm to M.S., but he said he did not believe the harm would be permanent in nature if there was a gradual reunification between M.S. and C.S. Such reunification would require C.S., her husband, D.D., and M.B. to cooperate and "do everything positive to facilitate the transition for the child." He suggested that he, Dr. Dyer and a Missouri therapist named Cynthia Mackie *230 might be helpful in assisting reunification of C.S. and M.S. When asked how long it would take M.S. to have a healthy transition through this unification plan with her birth mother, Dr. Silikowitz said, "You never know until you do it how long it's what's going to actually happen." He said that since M.B. was M.S.'s psychological parent, the transfer of custody would require her full cooperation, and he was concerned about tensions in her relationship with C.S. due to the court proceedings. His opinion favoring the reunification of C.S. with her child presumed C.S. had a stable home relationship. Dr. Silikowitz responded to a question that a change of custody was in the child's best interests. He did not say why and was not asked.

II.
The trial judge issued a written decision on December 19, 2002, in which he found that DYFS failed to prove by clear and convincing evidence that C.S.'s parental rights should be terminated and therefore, dismissed the complaint for guardianship. No findings or conclusion were stated as to J.G.
In declining to accept the arguments of DYFS and the law guardian, the judge rejected the argument that C.S. had abandoned M.S. by leaving New Jersey, concluding:
Without meaningful employment, stable residence, and without her child, C.S. realized her life was in "shambles" and she needed to get herself together. Her parents, who had resided in New Jersey for many years while she was growing up, had located to Mexico, Missouri. At one point, the Division was considering placing M.S. with her maternal grandparents. Like many other disenfranchised young people, C.S. sought security and safety with her parents.
In reaching this conclusion the trial judge gave little or no weight to the evidence that C.S. left New Jersey and failed to communicate with DYFS for four months and failed to attend court review hearings for six months. Similarly, weight was not given to the testimony of caseworkers Hill, Anderson and Rocha of C.S.'s repeated failure to comply with evaluations ordered by the court and programs supervised by DYFS. Rather the court focused on her "new life" in Missouri.
She testified that although she did not inform the Court of her move to Missouri, she began programs similar to the services she was to receive in New Jersey, including domestic violence group sessions and parenting skills.
She began attending twelve-step programs, Alcoholics Anonymous (A.A.) and Narcotics Anonymous (N.A.), where she met her husband, D.D.
The judge also relied upon C.S.'s marriage as a source of stability.
C.S. recently married D.D. They met at a Narcotics Anonymous (N.A.) meeting in February 2001. D.D. is a trained emergency medical technician/paramedic, with a number of years of hospital services. Presently he is the assistant activities coordinator at a nursing and rehabilitation center. He describes himself as a recovering addict who regularly attends N.A. meetings. D.D. is supportive of C.S. and her desire to be reunified with her daughter. He should be a source of strength to [her] as she deals with any substance abuse or other problems.
The trial judge rejected the findings and conclusions of Dr. Dyer, stating they were "not adequately supported or ... internally inconsistent in his report." He stated that Dr. Dyer's opinion did not consider the changes C.S. made in her life after leaving New Jersey.

*231 It was his testimony that he accepted the allegations in the Complaint as true. Generally, Dr. Dyer's understanding was that C.S. had largely abandoned M.S., refusing services offered by the Division, which resulted in the decision to place M.S. for adoption with M.B.
While that was true, it does not appear that he was adequately informed about the positive developments in her life with her new husband and her family in Missouri.
The judge also rejected Dr. Dyer's opinion because it was grounded in part on his findings that C.S. had a "chaotic and emotionally deprived childhood."
Dr. Dyer's conclusions that the birth mother was "a repeatedly traumatized child who was sexually abused, not permitted to gain closure by testifying in the trial of one of the perpetrators, exposed to a chaotic and emotionally deprived home environment ..." are not borne out by the facts he related in his report. Although sexually abused by the landlord, that does not account for calling her, "a repeatedly traumatized child." As for her not being allowed closure, that is pure speculation ... As for the "chaotic and emotionally deprived home environment," in his interview with the birth mother when asked about her family, she replied, "It was a pretty happy home ... Everything was pretty cool. I was pretty much a happy kid." Apparently where the birth mother and the aunt, M.B., who is estranged from their mother, and "spent all of [her] 20's in therapy," departed in their recall of their childhoods together, Dr. Dyer accepted M.B.'s versions as true.
Although the trial judge made no specific finding that C.S.'s childhood was a happy one, it appears that he accepted C.S.'s statements to that effect. He did not comment on the testimony of M.B. or the DYFS records indicating physical and psychological abuse. He also apparently gave no consideration to statements made by C.S.'s lawyer at an early review hearing that C.S. was opposed to any placement with her mother because of her "horrible" childhood and the physical abuse she suffered.
The judge found the findings and opinions of Dr. Silikowitz superior to those of Dr. Dyer because Dr. Silikowitz had "a more accurate understanding as to who [C.S.] actually is ..." Although acknowledging that M.S. "is a particularly sensitive and emotional child who has thrived under her aunt's care," the judge ordered her reunification with C.S. However, this placement was not made permanent or even subject to a timetable for final placement. Rather, the child was to remain with her maternal aunt until after the "full support and sincerity of everyone" including therapists to ease the change in custody.
In consideration of the four statutory factors in N.J.S.A. 30:4C:15-1(a) governing termination of parental rights, the trial judge made the following findings:
As for Factor 1, C.S. has achieved a level of stability in her own life, and will be able to provide M.S. a suitable home, with the support of a stepfather and maternal grandparents, who live close (sic) by. Any substance abuse problems are being overcome.
Factor 2: C.S. is willing and able to eliminate harm to M.S. and provide her a stable and safe home. Although there is great concern that separating M.S. from M.B. will cause serious and enduring emotional or psychological harm, the Court finds that such separation, guided and monitored by a mental health provider specializing in reunification, and the sincere cooperation of everyone affected, *232 will serve to ameliorate the adverse effects upon M.S.
Factor 3: The Division comported itself properly in this matter.
Factor 4: If there were termination of parental rights, that would not do more harm than good to M.S.
The order of December 26, 2002, restored the protective services complaint and directed DYFS to develop a reunification plan. Immediate and expanded visitation between C.S. and M.S. were ordered. Additionally, DYFS was to arrange for mental health services in Missouri to assist in the transition of custody and to develop a timeframe for transfer of M.S. from M.B. to C.S.
DYFS soon discovered that C.S. was no longer living with her husband and had returned to live with her parents while D.D. was residing at his father's home. In light of this new information DYFS then moved for reconsideration of the December 26, 2002 order.
The trial judge re-opened the guardianship hearing for further testimony on January 27, 2003. DYFS caseworker Toyna Fernande testified that both C.S. and D.D. refused to tell her when and where they would reside together, and that, as a result, DYFS could not proceed with any plan for reunification. Both C.S. and D.D. testified that they separated in December, prior to the court's order directing reunification. Both claimed that the separation was due to economic reasons, namely, that they could not then afford to maintain an apartment because they were obliged to repay D.D.'s father for monies lent to them to attend court hearings in New Jersey. C.S. and D.D. each testified that their plan for placement of M.S. was to have her live with them at the home of D.D.'s father, which required another home evaluation by the applicable Missouri social agency.
During her testimony, C.S. had the following exchange with the law guardian:
Q. Are you and [D.D.] experiencing any marital problems other than the debt?
A. We're fine ... We've grown close over this, over ... over so much.
DYFS argued for reconsideration of the December 26, 2002, order on grounds that there was no stable home for M.S. except with M.B. in Massachusetts. However, on January 29, 2003, the trial judge denied reconsideration and enforced his prior decision and order for reunification of M.S. with C.S.
The birth mother presently resides with her parents, M.S.'s grandparents, and the husband resides with his father, age 82, in his house. They hope to save enough for a down payment on a house. The husband earns $7.92 per hour for a full workweek, the birth mother about $115 every two weeks providing childcare. The Division has concerns as to the adequacy of the housing for [M.S.]. Although the grandparents' house had been earlier approved by the Missouri child protection agency, the Division has grave reservations whether their home is "an appropriate place to raise [M.S.] given the extent of the documented dysfunction in the family."
D.D. testified that his father is agreeable to having them live in his house, which is larger, in a quiet neighborhood, and would allow M.S. a safe and comfortable home.
After weighing all the matters presented, including those previously addressed, the Court concludes that its earlier findings still pertain and shall not be disturbed.
Although C.S. and D.D. are people of modest means, they are devoted to making a proper home for M.S. That they *233 would incur debt to appear in New Jersey for hearings and other related purposes is evidence of their sincerity.
When M.S. arrives in Mexico, Missouri, she will not only have her mother and stepfather, she will have the support of an extended family living in or near this small Missouri town. Despite the Division's concerns about the maternal grandparents, which apparently arose out of omission, rather than commission, the responsible caretaker shall be the birth mother. Having heard the testimony of each grandparent and being aware of the concerns of the Division, I am satisfied they will prove to be loving and supportive of M.S.
It is necessary to re-emphasize what was earlier stated in the Court's Decision and Order.
The Court appreciates that there are those, including employees of the Division, who may disagree with the Court's Decision and Order. They believe that the best interest of M.S. would be served by allowing her to remain with her maternal aunt, M.B., who wishes to adopt her.
Termination of parental rights based upon "best interests of the child" proceed pursuant to N.J.S.A. 30:4C-15.1. The Court made its findings pursuant to that statute.
Notwithstanding personal feelings as to which is best for M.S., it is clear that everyone involved in the process of reunifying this fragile child with her birth mother must pull together to achieve that purpose. The proceedings before the Court were adversarial, now that the decision has been made, there must be harmony of action.
On January 29, 2000, DYFS filed its notice of appeal from the order dismissing the guardianship complaint and denying its motion for reconsideration.
While this matter was on appeal, the Child Placement Review Board reviewed the placement of M.S. under the Child Placement Review Act, N.J.S.A. 30:4C-50. The Board issued its report on May 27, 2003, indicating disagreement with the Court's plan of reunification and recommending adoption by M.B. as a proper permanent plan for M.S. On April 14, 2003, the trial court conducted a permanency hearing as part of the protective services review under N.J.S.A. 9:6-8.4 and N.J.S.A. 30:4C-61.2 and again rejected adoption by M.B. Instead, the Court ordered DYFS to present a reunification plan by May 6, 2003, and further ordered that the matter proceed only under the guardianship docket. In the order prepared by the court the judge was critical of DYFS and reaffirmed its prior decision:
When it reactivated the Complaint for Protective Services, ... the Court believed this was the more appropriate vehicle to expedite reunification of the mother and child. It, however, had unexpected results. Whereas the Court expected everyone to move forward, apparently the Division concluded that this started the process all over again and they were at liberty to propose the same permanency plan, notwithstanding that the Court made findings and entered orders contrary to that plan.
Additionally, the Child Placement Review Board (Board) made a report critical of the Court's Decision, essentially raising the very same issues that were advanced during the four days of hearings and addressed in the Decision after trial and Order denying reconsideration.
Those reiterations are not helpful and only serve to divert progress toward reunification of the mother and child ...
...

*234 Although the Division has the right to appeal, the birth mother, C.S., has the right to have the orders for reunification with her child obeyed, unless a stay is entered.
...
Although the Division and Law Guardian claim that C.S. "abandoned" her child, which the Court addressed in its Decision and on the record in subsequent hearings, it appears that their primary drive is the belief that the child, M.S., would be better off with her aunt, M.B., therefore adoption would be in her best interests.
Our Supreme Court rejected such approach. "Merely showing that a child would be better off with an adoptive parent rather than with the biological parent, is not enough." Adoption of Children by G.P.B., Jr., 161 N.J. 396, 404, 736 A.2d 1277 (1999).
If the only thing the Court had to decide is whether M.S. would be better off with her aunt, M.B., or with her natural mother, the Court's conclusion could possibly be different. That was not what the Court was to decide; therefore, no conclusion based on that premise was made or even considered. The consideration as to what is in the best interests of the child is made in the context of the statute, N.J.S.A. 30:4C-15.1(a), and its four factors upon findings that they have been met by clear and convincing evidence.
In April 2003, DYFS reviewed records received from the clinic in Missouri where C.S. was receiving counseling. The records contained a report from C.S.'s therapist in which he related that C.S. told him on December 6, 2002, that D.D. had brutally beaten her in late November and that she had returned to live at her parents' home. DYFS filed a motion before us to supplement the record with this information or, alternatively, for a remand in light of this new development and because C.S. had testified three times following the assault without mentioning it and, when asked during her testimony, had specifically denied any marital problems. On May 8, 2003, we ordered a temporary remand for the trial judge to reconsider guardianship in light of the new evidence alleged by DYFS.
A remand hearing was conducted on June 3 and 5, 2003. Testifying by phone, C.A. Woodward, a clinical social worker in Missouri, testified that he commenced counseling with C.S. in November 2002, to deal primarily with stress related to these proceedings and he said that C.S. had demonstrated an increased ability to deal with stress. He stated that C.S. told him on December 6, 2002, that D.D. physically assaulted her by taping her hands together, beating her and throwing her out of their apartment. She related earlier abuse by D.D. including his refusal to take her for treatment after a foot injury. Mr. Woodward said that C.S. returned to live with D.D. after Christmas because she believed that living apart from him might hinder her efforts to gain custody of M.S. However, C.S. returned to live with her parents in March, stating that she feared D.D. could harm M.S. if she lived with him.
On cross-examination, Mr. Woodward said he was unaware that C.S. testified in December and January without mentioning the physical abuse she suffered and had in fact represented that she had no marital difficulties. Woodward said such misstatements concerned him because it raised issues as to C.S.'s truthfulness and her failure to disclose information relevant to the protection of her child. He was also surprised that C.S. testified to a happy childhood because she described her mother as "controlling and abusive" and indicated as late as December 6, 2002, that she *235 "had reservations" about having custody of her daughter while living with her mother. He also had not been told of C.S.'s suicide attempts when a teenager or of physical abuse inflicted on her by her mother. He conceded that based on this new information, C.S. was not as stable as he initially thought. However, while admitting he was testifying "as her advocate," he stated his belief that C.S. would be "a competent parent" in a stable environment.
C.S. testified by telephone that she was living with her parents that her relationship with her mother was "excellent." She said it was her intention to have M.S. live with her at her parents' house until she could afford her own apartment. She had no intention of living with D.D. again and planned to seek a divorce when she was financially able to do so.
When asked about her husband's assault upon her in November 2002, C.S. at first said she could not recall it. Later she said D.D. hit her and tried to tie her hands with duct tape. She also said she could not recall her previous testimony that her marital relationship was "fine," although she admitted that she had been assaulted before so testifying. She maintained that her initial separation from her husband was for financial reasons and not due to his physical abuse of her. However, she contradicted her prior testimony by stating that at no time did she have any intention of living with M.S. at her father-in-law's house with D.D. She did not recall so stating at the prior hearing.
C.S.'s mother testified by telephone that C.S. was living at her home and that they had a good relationship. She added that she agreed with C.S.'s plan that M.S. live with them, indicating that a separate room was available for the child. She claimed to be unaware of any physical abuse of her daughter by D.D. until C.S. came to live with her in March.
Dr. Dyer and Dr. Silikowitz were recalled at the remand hearing. Both doctors stated that the additional information fortified their original opinions. Dr. Dyer testified that the failure of C.S. to acknowledge her conflicted relationship with her mother and the non-disclosure of abuse by D.D. showed that C.S. lacked "personal maturity, emotional stability, judgment and impulse control necessary to provide nurturance, protection and stability for a child." On the other hand, Dr. Silikowitz said that the reports he reviewed enhanced her ability to be a parent because she was making excellent progress in therapy. He did, however, concede that if C.S. was misleading the court about her relationship with her husband, it would be "a serious situation."
On June 19, 2003, the trial judge filed a supplemental decision upholding his prior decision. Once again the judge found Dr. Silikowitz more persuasive than Dr. Dyer. Moreover, while he considered C.S.'s prior testimony of a harmonious marital relationship to be "at best, dissembling," he did not consider her misleading testimony to be of such weight as to alter his decision to deny termination of her parental rights. Similarly, the judge found C.S.'s testimony at the remand hearing to lack credibility in part, but he nonetheless found that she could be relied upon to parent M.S.
The obfuscation by C.S. to the Court is troubling. Even in her testimony in the instant hearing, she was at times quite candid, while at other times, evasive. When asked about details of the domestic violence, which she vividly described to her therapist, she could not recall any during her testimony. I understand that C.S. would want to portray everything about herself and her family in the best light possible, but that cannot justify lack of candor with the Court.
...

*236 Her mendacity in this matter, has been carefully weighed. Although it discredits her, I am satisfied that she is emotionally and spiritually committed to her child. She is, as noted above, a better person, who will protect and provide for her child.
With the exception of any reliance upon D.D. as a step-father, the trial judge reaffirmed his prior findings on the first two statutory factors of N.J.S.A. 30:4C-15.1a. Accordingly, he ordered that DYFS prepare and submit a reunification plan between C.S. and M.S. by July 3, 2003. By order of July 17, 2003, we stayed the order of the trial court pending determination of this appeal.
DYFS and the law guardian argue that it was error for the trial judge to deny the application to terminate the parental rights of C.S. to M.S. because clear and convincing evidence established that it was in the best interest of the child to grant that relief.

III.
The right of a parent to enjoy a relationship with his or her child is a fundamental right. Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); In re Guardianship of K.H.O., 161 N.J. 337, 346, 736 A.2d 1246 (1999); New Jersey Div. of Youth and Family Servs. v. A.W., 103 N.J. 591, 512 A.2d 438 (1986). Parents have a constitutionally-protected, fundamental liberty interest in raising their biological children. See, Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). Both the Federal Constitution and the New Jersey Constitution protect the inviolability of the family unit. Stanley, supra, 405 U.S. at 651, 92 S.Ct. at 1212-13, 31 L.Ed.2d at 558-59; A.W., supra, 103 N.J. at 599, 512 A.2d 438. This protection of parental rights continues when a child is placed in foster care. In re Guardianship of J.C., 129 N.J. 1, 9, 608 A.2d 1312 (1992). Parental rights may not be terminated by merely showing that the child would be better off with a prospective adoptive parent. A.W., supra, 103 N.J. at 602-03, 512 A.2d 438; In re Guardianship of Cope, 106 N.J.Super. 336, 340-41, 255 A.2d 798 (App.Div.1969). See also, Doe v. G.D., 146 N.J.Super. 419, 431, 370 A.2d 27 (App.Div.1976), aff'd sub nom, Doe v. Downey, 74 N.J. 196, 199, 377 A.2d 626 (1977). As stated by our Supreme Court,
We emphasize at the outset that the "best interests" of a child can never mean the better interest of the child. It is not a choice between a home with all the amenities and a simple apartment, or an upbringing with all the classics on the bookshelf as opposed to the mass media, or even between parents or providers of vastly unequal skills.
[A.W., supra, 103 N.J. at 602, 512 A.2d 438. (Citations omitted.) ]
Yet parental rights are not absolute. K.H.O., supra, 161 N J. at 347, 736 A.2d 1246; L.A.S., supra, 134 N.J. at 132, 631 A.2d 928. A child is not chattel in which a parent has an untempered property right. The State has a parens patriae responsibility to protect children from the probability of serious physical, emotional or psychological harm resulting from the action or inaction of their parents. J.C., supra, 129 N.J. at 10, 608 A.2d 1312; K.H.O., supra, 161 N.J. at 346-47, 736 A.2d 1246; Matter of Guardianship of J.T., 269 N.J.Super. 172, 190, 634 A.2d 1361 (App.Div.1993). In re Guardianship of J.R., 174 N.J.Super. 211, 224, 416 A.2d 62 (App.Div.1980); In re M., 74 N.J.Super. 178, 183, 181 A.2d 14 (App.Div.1962). "[P]arental rights are not inviolate when a child's physical or mental health is jeopardized." New Jersey Division of Youth and Family Servs. v. B.G.S., 291 N.J.Super. *237 582, 591, 677 A.2d 1170 (App.Div. 1996). As protector of children, the State may terminate the parent-child relationship if its continued existence is harmful to the child. Matter of Guardianship of D.M.H., 161 N.J. 365, 370, 736 A.2d 1261 (1999); J.R., supra, 174 N.J.Super. at 211, 416A.2d 62.
The balance between parental rights and the State's parens patriae responsibility is achieved through the best interest of the child test. K.H.O., supra, 161 N.J. at 347, 736 A.2d 1246. Under that test first enunciated in A.W., parental rights may be severed when:
(1) The child's health and development have been or will continue to be endangered by the parental relationship;
(2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his foster parents would cause serious and enduring emotional or psychological harm to the child;
(3) The division has made diligent efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and
(4) Termination of parental rights will not do more harm than good.
[N.J.S.A. 30:4C-15.1(a) (1998).]
Because the consequences of finding that a child's best interests are served by the termination of the parental bond are permanent and irreversible, the State has the burden of proof by clear and convincing evidence. Div. of Youth and Family Servs. v. L.C., 346 N.J.Super. 435, 439, 788 A.2d 330 (App.Div.2002); Div. of Youth and Family Servs. v. V.K., 236 N.J.Super. 243, 261, 565 A.2d 706 (App. Div.1989). It is important to underscore that the four statutory factors are not separate or independent of each other, but relate to and overlap one another to constitute a comprehensive standard to protect a child's physical, emotional and psychological well-being. A.W., supra, 103 N.J. at 604, 512 A.2d 438; K.H.O., supra, 161 N.J. at 348, 736 A.2d 1246.
The focus of the "best interests" test must also be viewed in light of amendments to N.J.S.A. 30:4C-15, which brought New Jersey in conformity with the Federal Adoption and Safe Families Act of 1997 (ASFA), 42 U.S.C.A. §§ 301, 671(16), 675(5)(A)(ii). Both the Federal and the New Jersey statutes reflect reforms acknowledging the need for permanency of placements by placing limits on the time for a birth parent to correct conditions in anticipation of reuniting with the child. The emphasis has shifted from protracted efforts for reunification with a birth parent to an expeditious, permanent placement to promote the child's well-being. N.J.S.A. 30:4C-11.1; D.M.H., supra, 161 N.J. at 385, 736 A.2d 1261; K.H.O., supra, 161 N.J. at 357-59, 736 A.2d 1246. A child cannot be held prisoner of the rights of others, even those of his or her parents. Children have their own rights, including the right to a permanent, safe and stable placement.
Both DYFS and the law guardian argue that the factual findings of the trial judge were unsupported by credible evidence and that the orders denying termination of C.S.'s parental rights and directing reunification are antithetical to the child's best interests. In evaluating these arguments we are mindful of our limited scope of review in a non-jury case. We will not disturb the factual findings of *238 a trial judge unless "they are so wholly unsupportable as to result in a denial of justice," and we will uphold such findings whenever they are supported by adequate, substantial and credible evidence." Rova Farms Resort v. Investors Insurance Co., 65 N.J. 474, 483-84, 323 A.2d 495 (1974); Cesare v. Cesare, 154 N.J. 394, 412, 713 A.2d 390 (1998). Deference is especially appropriate "when the evidence is largely testimonial and involves questions of credibility" since the trial court has a different perspective by virtue of seeing and hearing the witnesses. In re Return of Weapons to J.W.D., 149 N.J. 108, 117, 693 A.2d 92 (1997); Pascale v. Pascale, 113 N.J. 20, 33, 549 A.2d 782 (1988); Gallo v. Gallo, 66 N.J.Super. 1, 5, 168 A.2d 228 (App.Div. 1961).
However, our scope of review is enhanced when a trial judge is "clearly mistaken and his decision so plainly unwarranted that the interests of justice demand intervention and correction." Formosa v. Equitable Life Assurance Soc'y, 166 N.J.Super. 8, 20, 398 A.2d 1301 (App. Div.1979), certif. denied, 81 N.J. 53, 404 A.2d 1153 (1979); Maggio v. Pruzansky, 222 N.J.Super. 567, 577, 537 A.2d 756 (App.Div.1988). Our deference is also reduced when the focus is not credibility but "alleged error in the trial judge's evaluation of the underlying facts and the implication to be drawn therefrom." Snyder Realty v. BMW of N. America, Inc., 233 N.J.Super. 65, 69, 558 A.2d 28 (App.Div.), certif. denied, 117 N.J. 165, 564 A.2d 883 (1989); J.T., supra, 269 N.J.Super. at 188-89, 634 A.2d 1361.
We are mindful that cases of this nature are extremely fact-sensitive. K.H.O., supra, 161 N.J. at 348, 736 A.2d 1246; L.A.S., supra, 134 N.J. at 139, 631 A.2d 928. The stakes are so high, the rights to be protected so great and the consequences or error so irreversible that intense scrutiny is mandated. See, Santosky, supra, 455 U.S. at 753, 102 S.Ct. at 1393, 71 L.Ed.2d at 607. It is for this reason we have summarized the facts of the proceedings in such detail. As a result of our review, we are constrained to reverse the orders of the trial court. We find that crucial findings made by the trial judge are unsupported by substantial, credible evidence in the record and presents error in his application of the facts to the legal issues presented.
The trial judge based his order denying termination on his determination that the State did not present clear and convincing evidence of the first two prongs of the "best interests of the child" standard first enunciated in A.W. and codified in N.J.S.A. 30:4C-15.1(a). The first prong requires a clear and convincing showing that the child's safety, health and development have been or will continue to be endangered by the parental relationship. The primary focus is the issue as to whether the parent has harmed the child or may harm the child in the foreseeable future. A.W., supra, 103 N.J. at 607, 512 A.2d 438. As to this prong, the trial judge stated, "C.S. has achieved a level of stability in her own life and will be able to provide a safe home." No finding was made by the judge as to whether C.S.'s actions had endangered the health or development of M.S. We find that the trial judge erroneously focused on lifestyle changes of C.S. rather than giving proper weight to the extent of harm C.S. caused to her daughter.
It is undisputed that M.S. suffered harm by a lack of permanency in her life due to repeated foster placements beginning with her release from the hospital at four days old. M.B. testified without contradiction that when the ten month old child came to live with her, M.S. was withdrawn, fearful and needy. It took time for her to accept *239 her new placement and develop a sense of belonging and well-being. Moreover, both Dr. Dyer and Dr. Silikowitz testified that M.S. is a child fearful of change.
The trial judge found C.S. moved from New Jersey to Missouri because her life was in "shambles" and she needed to "get herself together." He opined that "[L]ike many other disenfranchised young people, C.S. sought the security and safety of her parents." Even assuming that this analysis of C.S.'s motivation to leave New Jersey is correct, it does not change the fact that C.S. moved halfway across the country without notification to the court or DYFS of either her plan to move or her destination, leaving the custody and nurturing of her child to foster parents. Her actions were in derogation of her responsibilities as a parent. Moreover, according to the undisputed testimony, the development of M.S. was significantly affected as a result.
The implicit finding of the trial judge that C.S.'s move from New Jersey was an action taken in the best interests of her child is not substantiated by the record. The clear and largely unrebutted evidence is that from the outset C.S. failed to take any substantive steps to be reunited with M.S. She was given many opportunities to "get herself together" in New Jersey and failed to do so. Throughout the period of time up to her relocation to Missouri, she demonstrated consistent non-compliance with orders and conditions imposed by the Family Part judge then in charge of the case. She was discharged from a drug program of her own selection for non-attendance and continued to test positive for use of marijuana. She squandered an opportunity to reunite with her child in a structured environment at no cost by impulsively walking out of the program. She did not attend parenting classes, which well may have underscored the need for her stable presence in the life of her child. She failed to exercise visitation. She repeatedly disappeared from view of DYFS and the court, leaving no address or phone number and giving false or misleading information as to her whereabouts. She continued to disobey court orders to attend programs and evaluations vital to her reunification with M.S. When the Family Part judge finally suspended her visitation to force compliance, the only effect was to hasten her intended move to Missouri. She admitted during her testimony that at the last compliance hearing she attended, she mouthed her intention to cooperate to the judge despite her intention to leave the State. At no time did C.S. seek assistance from DYFS, her appointed attorney, the law guardian for M.S. or the Family Part judge to reunite with her child before leaving New Jersey.
After she left the State, the credible evidence discloses that C.S. made no effort to advise DYFS of her location or inquire as to the health and well-being of her child for several months. While we note that C.S. testified she called her DYFS caseworker weekly and sometimes as much as four or five times a week, both the testimony of the caseworker and the DYFS records contradict her statements. Notably, the trial judge made no credibility findings on this issue, although he noted C.S.'s "mendacity" on other matters following the remand hearing. Considering C.S.'s fabrications of compliance with orders of the court, her testimony on this issue must be regarded with skepticism. Moreover, it is undisputed that she never advised the court or her attorney of her move to Missouri until after the filing of the complaint for guardianship.
Contrary to the finding of the trial judge, the trial record clearly and convincingly shows that C.S. abandoned her responsibilities through repeated non-compliance *240 with court directives and by removing herself from the jurisdiction of the court. The consequence was placement of M.S. in successive foster homes, resulting in a withdrawn and fearful child. Analyzing the record from the perspective of best interests of the child, we conclude that the health and development of M.S. were endangered by the actions of C.S.
Moreover, the record also indicates that M.S.'s health and development would be endangered by reunification with the birth mother with whom she has never lived. Both Dr. Dyer and Dr. Silikowitz agreed that a custodial change would cause serious harm because of the passage of time and the significant bonding M.S. has with M.B. Dr. Dyer opined there was serious risk that M.S. would develop a serious personality disorder if she was deprived of her psychological parent at this stage of her development.
The trial judge adopted the recommendation of Dr. Silikowitz for a gradual weaning of the psychological mother-daughter relationship between M.S. and M.B. through a supervised and staged immersion into C.S.'s home in order to ameliorate the anticipated psychological harm to M.S. While this approach is consistent with the desire of C.S. to parent her daughter, it does not serve the best interests of M.S.'s documented need for expeditious permanent placement with the parent figure with whom she has bonded. The strong public policy of New Jersey favors permanency of child placement. See, e.g., DMH, supra, 161 N.J. at 385, 736 A.2d 1261; N.J.S.A. 30:4C-11.1. As stated by our Supreme Court,
In all our guardianship and adoption cases, the child's need for permanency and stability emerges as a central factor. The trend over the last thirty years has been toward foster care reforms that place limits on the amount of time a parent may have to correct conditions at home in anticipation of reunification.
[K.H.O., supra, 161 N.J. at 357-58, 736 A.2d 1246. (Citations omitted.) ]
Moreover, the plan adopted by the trial court based on Dr. Silikowitz's report and supplemented by suggestions from the Arthur Center in Missouri was grounded on C.S.'s testimony of a stable relationship and stable environment for reunification with M.S. Subsequent disclosures revealed this testimony was misleading at best. Instead of the stable marital relationship to which C.S. and D.D. testified, it was revealed that the relationship was short-lived, volatile and marred by violence. It is clear from the record that C.S. repeatedly fabricated her living circumstances in Missouri to mislead the court. She said that the reason for her separation from D.D. was due solely to economics and that she intended to reunite with D.D. and live with M.S. at the home of her father-in-law. Later she admitted the separation followed a beating by D.D. and that she never intended to live with her father-in-law.
At the remand hearing C.S. testified she planned to live with M.S. at her mother's home and described a good relationship with her mother. However, just a few months earlier she told her therapist that she did not want her daughter living at her mother's home. Throughout these proceedings C.S.'s testimony about a good relationship with her mother was contradicted not only by the testimony of M.B. but also by uncontradicted DYFS and domestic violence reports and at times by C.S. herself. If the past is prologue to the future, their relationship bears the risk of instability. Placement of M.S. with C.S. under these circumstances poses an unnecessary risk and an uncertain future far from the stable rock of her psychological parent.
*241 Our review of the record convinces us that the findings of the trial judge that C.S. could provide a suitable and safe home for M.S. without danger to her development was not based on substantial, credible evidence, and the court did not give sufficient weight to the extent of psychological harm which such a change in custody would cause to the child. We find that the record supports the contention of DYFS that clear and convincing evidence was presented to satisfy the first prong of the statutory best interests standard of N.J.S.A. 30:4C-15.1(a)(1).
The second criteria of the best interests test, N.J.S.A. 30:4C-15.1(a)(2), obliges the State to prove that the defendant is unwilling or unable to eliminate harm to her child and that the lack of permanent placement will add to the harm suffered by the child. As to this factor, the trial judge made the following finding:
Factor 2: C.S. is willing and able to eliminate harm to M.S. and provide her a stable and safe home. Although there is great concern that separating M.S. from M.B. will cause serious and enduring emotional or psychological harm, the Court finds that such separation, guided and monitored by a mental health provider specializing in reunification, and the sincere cooperation of everyone affected, will serve to ameliorate the adverse effects upon M.S.
As we have stated, the four factors comprising the best interests are not separate but interrelated. It is therefore unnecessary for us to repeat all of the salient facts in support of our conclusion that the trial judge erred and that the State produced clear and convincing evidence to satisfy the second factor.
In A.W., supra, 103 N.J. at 607, 512 A.2d 438, the Supreme Court stated that the inquiry under N.J.S.A. 30:4C-15 (a)(2) is to determine whether "it is reasonably foreseeable that the parent can cease to inflict harm upon the children entrusted to their care. No more and no less is required of them than that they will not place their children in substantial jeopardy to physical or mental health." This test may be satisfied in a number of ways, including "indications of parental dereliction and irresponsible recurrent drug abuse, the inability to provide a stable and protective home, the withholding of parental attention and care ... with the resultant neglect and lack of nurture of the child." K.H.O., supra, 161 N.J. at 348, 736 A.2d 1246. Whatever the reason, C.S. has demonstrated an inability to care for her daughter since her birth, and there is no realistic assurance that she is able to either cure the past harm to her daughter or prevent recurrent harm. Her propensity for deceit by shaping facts to suit her purpose as well as her outright fabrications are obvious in the record and essentially unchallenged.
We further find that the trial court again erred by focusing almost solely upon the parental rights of C.S. and failed to properly weigh and consider the rights of M.S. independent of her biological mother. The uncontradicted fact is that M.S. is bonded to her maternal aunt and not to her natural mother. Where foster parent bonding is an issue, the court must determine whether breaking the bond with a foster parent will lead to "serious and enduring" or "profound" harm. J.C., supra, 129 N.J. at 18, 608 A.2d 1312; K.L.F., supra, 129 N.J. at 32, 608 A.2d 1327; see also, In the Matter of Adoption of A Child by P.S. and J.S., 315 N.J.Super. 91, 94, 716 A.2d 1171 (App.Div. 1998). While the trial judge acknowledged concern that separating M.S. from M.B. would cause "serious and enduring emotional or psychological harm," he *242 found that cooperation between "everyone affected" and monitoring by a therapist "specializing in reunification" in Missouri would ameliorate the harm to M.S. These findings were at best hopeful expectations unsupported by the record and contrary to the goal of providing stability to the child by continued placement with her psychological parent.
With regard to the applicability of the second factor of the best interests test to the case sub judice, we note the comments of our Supreme Court on bonding between a child and foster parents:
[I]f there is clear and convincing evidence that the child will suffer substantially from a lack of stability and permanent placement and from the disruption of her bond with foster parent, this will satisfy N.J.S.A. 30:4C-15.1(a)(2).
[K.H.O., supra, 161 N.J. at 363, 736 A.2d 1246.]
We find that the trial court erred and that DYFS proved by clear and convincing evidence that C.S. is unable to eliminate the harm to C.S. and, alternatively, that M.S. would suffer undue harm by the severing of her psychological bond with M.B. These proofs were sufficient to satisfy the second criteria of the best interests test. K.H.O., Ibid.; N.J.S.A. 30:4C-15.1(a)(2).
We agree with the trial judge's determination that DYFS established by clear and convincing evidence that reasonable efforts were made by DYFS to reunite M.S. with her biological family and to consider alternatives to termination. J.G., the biological father, did not comply with court-mandated programs and never made any effort or serious suggestion for placement of his child. As to C.S., the record reflects reasonable attempts by DYFS in remedying the circumstances and conditions relating to placement of M.S. only to have them fail due to C.S.'s failure to cooperate or follow through on her court-imposed obligations. DYFS's efforts are not measured by their success. DMH, supra, 161 N.J. at 393, 736 A.2d 1261. Here the failure of reunification between M.S. and C.S. was due to the birth mother's failure or inability to provide for her child.
Regarding the fourth criteria of N.J.S.A. 30:4C-15.1(4), we concur with the trial judge that the termination of C.S.'s parental rights will not do more harm than good. The ultimate objective of the statutory scheme inclusive of all four factors of the best interests test is the protection of the physical and psychological well-being of the child. J.R., supra, 174 N.J.Super. at 223, 416 A.2d 62. Inherent in the fourth factor is that a child has a "paramount need for a permanent and defined parent-child relationship," J.C., supra, 129 N.J. at 26, 608 A.2d 1312, as well as a deep need for a nurturing adult, commonly termed the "psychological parent." Here M.S. has been provided with both a stable, permanent placement and a nurturing psychological parent in M.B. Our review of the record convinces us, therefore, that clear and convincing proof was produced as to the fourth criteria of the best interests test.
The determination of an application to terminate parental rights is an "agonizing burden" posing "an almost unsolvable dilemma" to our judicial system. A.W., supra, 103 N.J. at 597, 512 A.2d 438; Matter of Guardianship of A.A.M., 268 N.J.Super. 533, 547, 634 A.2d 116 (App. Div.1993). This case is more difficult than most. We understand that our decision will engender deep disappointment to C.S. In this respect we are hopeful that M.B. will be true to her word when she testified she intended for C.S. to have continued contact with M.S. after her adoption. While a so-called "open adoption" cannot *243 be judicially enforced in this State, K.H.O., supra, 161 N.J. at 361-62, 736 A.2d 1246, such an arrangement between these sisters would enable C.S. to play a part in her daughter's life and, even more importantly, would enable M.S. to benefit from the love of both her birth mother and her adoptive mother. See, K.H.O., supra, 161 N.J. at 364, 736 A.2d 1246 (O'Hern, J. concurring).
We reverse and remand for the entry of a judgment terminating the parental rights of C.S. and J.G. and committing the child, M.S., to the guardianship of DYFS pursuant to N.J.S.A. 30:4C-15 to -20 for the purposes of adoption by M.B.
Reversed.
NOTES
[1] J.G. defaulted in this action and never moved to vacate the default. Nonetheless, he was represented by counsel throughout the guardianship trial as well as the hearings on the motion for reconsideration on a remand from this court. His attorney fully participated and cross-examined witnesses. J.G. appeared only briefly on one trial day. He did not testify, and no witnesses were called on his behalf. In an obvious oversight, the trial judge made no findings as to J.G., and no order was entered with respect to the termination of his parental rights or reunification with M.S. On appeal his attorney filed a two page letter stating that he supports the position of C.S. that the decision should be affirmed. He adds that "he represents that he is capable of performing the functions of an appropriate father."