# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2325-19

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

      Plaintiff-Respondent,

v.

S.S.M.,

      Defendant,

and

M.H.W.,

      Defendant-Appellant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF
M.Z.M., a minor.

_____

Argued June 22, 2021 – Decided July 8, 2021

Before Judges Yannotti and Haas.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Essex County, Docket No. FG-07-0131-19.

T. Gary Mitchell, Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; T. Gary Mitchell, of counsel and on the briefs).

Julie B. Colonna, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Sookie Bae-Park, Assistant Attorney General, of counsel; Julie B. Colonna, on the brief).

PER CURIAM

Defendant M.H.W.,[1] the biological father of M.Z.M. (Mark), born in April 2012, appeals from the April 16, 2020 amended judgment of guardianship terminating his parental rights to the child.[2] Defendant contends that the Division of Child Protection and Permanency (Division) failed to prove each prong of N.J.S.A. 30:4C-15 by clear and convincing evidence.

The Law Guardian filed a cross-appeal from the judgment on Mark's behalf. In February 2021, however, the Law Guardian filed a motion to dismiss

---

[1] We refer to the adult parties by initials, and to the child by a fictitious name to protect their privacy. R. 1:38-3(d)(12).

[2] The judgment also terminated the parental rights of Mark's biological mother, S.S.M. However, S.S.M. has not filed a notice of appeal from that determination and, therefore, she is not a party to this appeal.

Mark's cross-appeal, explaining in its motion brief that the child "no longer wishes to challenge the trial court's decision to terminate his father's parental rights." The Law Guardian further stated:

> [Mark] is a party to this appeal and his best interests are paramount in guardianship proceedings under Title 30. He has a right to assert a position in this appeal, and the cross-appeal filed on his behalf no longer represents his position. The issues addressed in this appeal -- termination of parental rights and the child's best interests -- are the most important issues in [Mark's] life.

On March 12, 2021, we granted the Law Guardian's motion to dismiss Mark's cross-appeal. Thereafter, the Law Guardian submitted a letter stating that Mark "is taking no position regarding the appeal filed by [defendant] regarding termination of parental rights entered against him by the trial court . . . ."

Based on our review of the record and applicable law, we are satisfied that the evidence in favor of the guardianship petition overwhelmingly supports the decision to terminate defendant's parental rights. Accordingly, we affirm substantially for the reasons set forth by Judge Nora J. Grimbergen in her thorough and thoughtful written decision rendered on January 28, 2020.

We will not recite in detail the history of the Division's involvement with Mark and his parents. Instead, we incorporate by reference the factual findings

and legal conclusions contained in Judge Grimbergen's decision. We add the following comments.

The Division assumed custody of Mark and his four half-siblings from their mother, S.S.M., in July 2012, when he was only three months old. Defendant was not involved with Mark until April 2013, when he was identified as the child's father. About a year later, defendant expressed an interest in caring for Mark. At that time, defendant admitted that he was a daily marijuana user and, therefore, he was referred to the first of many substance abuse programs. Defendant failed to complete any of these programs. Throughout the years that followed, defendant periodically tested positive for marijuana use and, on two occasions, tested positive for phencyclidine.[3]

The Division provided defendant with psychological evaluations and supervised visits with Mark. After finally putting together a string of negative drug screen results between March and June 2017, the trial court placed Mark in defendant's and his wife's custody in July 2017. However, defendant then tested positive for marijuana and phencyclidine following a court appearance in

---

[3] Defendant disputed the results of the tests indicating that he had used phencyclidine.

October 2017. A urine screen taken two days later was positive for marijuana, but negative for phencyclidine.

Due to defendant's continued drug use, and his failure to attend five of the six group sessions required by his then-current substance abuse program, the court removed Mark from defendant's care in April 2018, and placed him with defendant's wife after ordering defendant to leave the home. However, this arrangement only lasted until May 2018 because defendant's wife allowed him to return to the house in violation of the court's order. Mark was then placed in a resource home.

The Division explored other placements for Mark, including defendant's wife, who was ruled out after she failed to complete the resource parent licensing process. At some point, defendant and his wife separated and defendant advised the Division he was "homeless." However, defendant subsequently moved in with his brother. Although defendant had a job and earned "$650 per week after taxes," he did not take advantage of the referrals the Division gave him to secure housing appropriate for himself and a child.

Defendant initially attended most of the visitation sessions the Division scheduled for him with Mark after the child was removed from defendant's home. However, defendant missed six visits in late 2018, which greatly upset

the child. Defendant then disappeared for a couple of months. When he resumed contact with the Division in February 2019, defendant stated he had no room for a child at his brother's home and that he had stopped attending his latest substance abuse program.

In June 2019, the Division placed Mark with his current resource parent, "Ms. B.," who wishes to adopt him. Defendant asserts there is no competent evidence in the record to support Judge Grimbergen's finding that Ms. B. is committed to adopting Mark because she did not testify at the trial. However, Ms. B. testified under oath at a pre-hearing conference on November 13, 2019 that Mark was "doing amazing right now. He's flourishing with us. And he's doing very good in school, and he's doing very well socially, and I'm willing to do whatever it takes to, you know, move this forward and have him be with me forever." (emphasis added). Although given the opportunity to do so by the judge, defendant's trial attorney did not cross-examine Ms. B.

Dr. Mark D. Singer, the Division's expert in psychology and bonding, conducted bonding evaluations between Mark and Ms. B., and Mark and defendant. Dr. Singer testified that both the resource parent and defendant were significant figures in Mark's life. Dr. Singer further stated that Mark would suffer some harm if his tie with either of these individuals was severed.

A-2325-19

However, Dr. Singer opined that Ms. B. was Mark's "central parental figure" and was "functioning as the child's psychological parent." On the other hand, Dr. Singer concluded that defendant "was not a viable parenting option nor likely to become one in the foreseeable future." Dr. Singer based this prognosis upon defendant's inconsistent visits with Mark over the years and defendant's inability to provide the child with permanency. Indeed, defendant had no plan for caring for the child other than to suggest that his now-estranged wife would assist him. However, he had not yet even broached this subject with his spouse.

Under these circumstances, Dr. Singer opined that "[t]he totality of the data suggests that termination of parental rights followed by adoption, would do more good than harm and would serve the child's best interests." In this regard, Dr. Singer found that Ms. B. was open to permitting defendant to continue to maintain contact with Mark, and to arrange for him to see his half-siblings who were the children of both of his parents. Ms. B. remained committed to this possibility even though defendant refused to meet with her to discuss these arrangements when offered two opportunities to do so.

In rendering his opinion, Dr. Singer took into account the child's statement to him during the evaluation that he preferred to live "at Daddy's house" because

his "brothers are there." Dr. Singer noted that the child would be traumatized if he were returned to defendant's care and thereafter had to be removed again. Thus, Dr. Singer concluded that Ms. B., who Mark referred to as "mommy," was better positioned to ameliorate any harm that might be caused by severing the child's bond with defendant.

Defendant did not testify at the two-day trial, but he presented the testimony of Dr. Andrew P. Brown, III, an expert in psychology and bonding. Dr. Brown conducted a bonding evaluation of Mark and Ms. B., and opined that the child was "very comfortable and relaxed" with his resource parent, and "had a positive attachment" to her.

Dr. Brown did not perform a bonding evaluation between defendant and Mark because defendant failed to show up for the scheduled appointment on three separate occasions. Indeed, Dr. Brown never met or spoke to defendant. Thus, Dr. Brown conceded he was not able to "able to assess [defendant] at all," or draw any conclusions as to his "parenting capacity."

In spite of this, Dr. Brown opined that defendant had a significant bond with Mark. Because defendant was the child's biological father, Dr. Brown stated that only defendant was capable of ameliorating the harm that would result if Mark's connection to Ms. B. ended. Nevertheless, Dr. Brown did not

8

recommend a "reunification" between defendant and Mark, and did not render an opinion on when defendant might be able to parent the child.

Under these circumstances, Judge Grimbergen rejected Dr. Brown's opinion in favor of the recommendations provided by Dr. Singer. The judge stated:

> Dr. Brown's opinion that no one other than a biological parent can mitigate harm is entirely unsupported in this case as he did not even meet [defendant], let alone evaluate him to determine whether he meets the criteria for whatever hypothetical parent he believes can be the only one to ease the damage [Mark] could suffer. He provided no factual basis or explanation for his belief that Ms. B[.] could not mitigate any harm [Mark] would suffer if the attachment to [defendant] was severed. He opined that [Mark] has a secure attachment to Ms. B[.] and calls her "mommy." It stands to reason that without ever evaluating [defendant], Dr. Brown is incapable of opining on [defendant's] ability to mitigate harm. Dr. Brown himself acknowledged that [defendant] is not ready to parent and does not recommend reunification.

In her extensive opinion, Judge Grimbergen reviewed the evidence presented at the two-day trial, and concluded that (1) the Division had proven all four prongs of the best interests test by clear and convincing evidence, N.J.S.A. 30:4C-15.1(a); and (2) termination of defendants' parental rights was in Mark's best interests. In this appeal, our review of the trial judge's decision is limited. We defer to her expertise as a Family Part judge, <u>Cesare v. Cesare,</u>

154 N.J. 394, 413 (1998), and we are bound by her factual findings so long as they are supported by sufficient credible evidence. N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 279 (2007) (citing In re Guardianship of J.T., 269 N.J. Super. 172, 188 (App. Div. 1993)).

After reviewing the record, we conclude that Judge Grimbergen's factual findings are fully supported by the record and, in light of those facts, her legal conclusions are unassailable. We therefore affirm substantially for the reasons that the judge expressed in her well-reasoned opinion.

On appeal, defendant asserts that his chronic use of marijuana would likely now be legal under recent changes in New Jersey law,[4] and his failure to provide a suitable home for Mark was due to his lack of funds. Defendant also argues that Division failed to offer him reasonable services to address these issues. We disagree.

The record does not support defendant's claim that the judge terminated his parental rights solely because defendant was violating the law by using

---

[4] In the New Jersey general election held on November 3, 2020, the voters adopted a constitutional amendment effective as of January 1, 2021, that legalized the possession, consumption, and commercialization of cannabis and products containing it by persons twenty-one years of age or older, but potentially "subject to regulation by the Cannabis Regulatory Commission." N.J. Const. art. IV, § 7, ¶ 13.

marijuana or because he allegedly could not secure adequate housing due to poverty. Defendant admitted that he was using marijuana on a daily basis and, by 2017, was smoking "three blunts per day." Accordingly, the Division properly offered him a number of opportunities to participate in substance abuse programs. Defendant failed to complete any of these programs.

While defendant did not have a home shortly after he separated from his wife, he quickly secured shelter with his brother and was netting approximately $2795 each month from his job. The Division also referred him to the appropriate agency to assist him in locating affordable housing for himself and Mark. Once again, defendant failed to take advantage of this opportunity.

Thus, the judge terminated defendant's parental rights because he took no concrete steps to become Mark's permanent caregiver after he was identified as the child's father in 2013. Instead, defendant missed visits with the child, failed to attend a bonding evaluation on three different occasions, and refused to meet with the child's resource parent. Defendant's own expert, Dr. Brown, was not able to opine that defendant should be reunited with Mark and could not provide an estimate of when, or if, reunification could occur.

Children are entitled to a permanent, safe, and secure home. We acknowledge "the need for permanency of placements by placing limits on the

time for a birth parent to correct conditions in anticipation of reuniting with the child." N.J. Div. of Youth & Family Servs. v. C.S., 367 N.J. Super. 76, 111 (App. Div. 2004). As public policy increasingly focuses on a child's need for permanency, "[t]he emphasis has shifted from protracted efforts for reunification with a birth parent to an expeditious, permanent placement to promote the child's well-being." Ibid. (citing N.J.S.A. 30:4C-11.1). That is because "[a] child cannot be held prisoner of the rights of others, even those of his or her parents. Children have their own rights, including the right to a permanent, safe and stable placement." Ibid.

The question then is "whether the parent can become fit in time to meet the needs of the children." N.J. Div. of Youth & Family Servs. v. F.M., 375 N.J. Super. 235, 263 (App. Div. 2005); see also N.J. Div. of Youth & Family Servs. v. P.P., 180 N.J. 494, 512 (2004) (indicating that even if a parent is trying to change, a child cannot wait indefinitely). After carefully considering the record, Judge Grimbergen reasonably determined that defendant was not able to parent the child, and would not be able to do so for the foreseeable future. Under those circumstances, we agree with the judge that any further delay of permanent placement would not be in Mark's best interests.

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-2325-19