# **RECORD IMPOUNDED**

### **NOT FOR PUBLICATION WITHOUT THE APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2814-22

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

A.M.K.,[1]

     Defendant,

and

H.B.,

     Defendant-Appellant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF J.A.B.,
a minor.

_____

Argued January 17, 2024 – Decided January 23, 2024

---

[1] We refer to the adults and the child involved in this case by initials to protect their privacy. See R. 1:38-3(d)(12).

Before Judges Haas and Gooden Brown.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Camden County, Docket No. FG-04-0044-23.

Adrienne Marie Kalosieh, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Adrienne Marie Kalosieh, of counsel and on the briefs).

Lakshmi Ranjit Barot, Deputy Attorney General, argued the cause for respondent (Matthew J. Platkin, Attorney General, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel; Lakshmi Ranjit Barot, on the brief).

Noel Christian Devlin, Assistant Deputy Public Defender, argued the cause for minor (Joseph E. Krakora, Public Defender, Law Guardian, attorney; Meredith Alexis Pollock, Deputy Public Defender, of counsel; Noel Christian Devlin, of counsel and on the brief).

PER CURIAM

Defendant H.B. is the biological father of J.A.B. H.B. appeals from the April 25, 2023 judgment of guardianship terminating his parental rights to the child.[2] H.B. contends that the Division of Child Protection and Permanency (Division) failed to prove the fourth prong of N.J.S.A. 30:4C-15.1(a) by clear

---

[2] The judgment also terminated the parental rights of J.A.B.'s biological mother, A.M.K. However, A.M.K. has not filed a notice of appeal from that determination and, therefore, she is not a party to this appeal.

and convincing evidence. H.B. also asserts that the trial judge abused her discretion by denying his request for an adjournment of the proceedings and by not "inquir[ing] into [his] request to relieve his counsel." The Law Guardian supports the termination on appeal as it did before the trial court.

Based on our review of the record and applicable law, we are satisfied that the evidence in favor of the guardianship petition overwhelmingly supports the trial judge's decision to terminate H.B.'s parental rights, her decision to deny H.B.'s adjournment request, and her handling of H.B.'s outbursts during the proceedings. Accordingly, we affirm these decisions.

I.

J.A.B. was born in December 2019, prematurely, weighing less than three pounds, having been exposed to cocaine and methadone in utero. She was placed in the Neonatal Intensive Care Unit due to her numerous medical issues. A.M.K. had not received any prenatal care, had a long history of substance abuse, and used cocaine and heroin during her pregnancy.

J.A.B. has never been in H.B.'s or A.M.K.'s custody. After J.A.B. was released from the hospital in January 2020, the trial court granted the Division custody of the child and the Division placed her with her current resource parents. The Division asked H.B. and A.M.K. to identify possible relatives to

act as a resource family for J.A.B., but they did not do so until over a year into the litigation.

H.B. was hostile, argumentative, and aggressive from the very beginning of J.A.B.'s life. He was restricted from visiting J.A.B. without security present when she was hospitalized shortly after her placement for breathing difficulties. Even when allowed visits, H.B. was inappropriate with his daughter, snapping his fingers in her face and telling her to wake up.

When the Division later attempted to set up therapeutic visits for H.B. and J.A.B., he was so confrontational that the provider had to carry a panic button and required a security officer to be present. On another occasion, H.B. made unwelcome sexual remarks toward the visit supervisor, forcing the agency to terminate therapeutic visitation.

Despite these issues, the Division worked with H.B. and A.M.K., offering substance abuse and domestic violence services, changing visitation dates to suit their schedules, and accommodating them even when they were late. When the COVID-19 pandemic began, the Division set up virtual visits for the parents, since J.A.B. was high-risk due to her respiratory issues from birth and could not do in person visits. H.B. was required to undergo substance use screens weekly

A-2814-22

once visitation with J.A.B. began, but he failed to fully comply. H.B. tested positive for alcohol on two of the three screens he did complete.

H.B. and A.M.K. would disappear for weeks or months at a time without contacting the Division or seeing J.A.B. For example, H.B. had no contact with the Division from May 7, 2020 to August 27, 2020, and the Division began a formal search for the parents. When the Division finally got in contact with H.B., he was immediately confrontational with Division workers, shouting, cursing, and refusing to give an updated address. This sporadic contact continued through the rest of 2020. In January 2021, H.B. was incarcerated on aggravated assault charges in which A.M.K. was the victim.

That same month, A.M.K. identified H.B.'s adult biological daughter from another relationship, T.B.-T., as a possible caretaker for J.A.B. The Division contacted T.B.-T. to begin the required licensing process. Due to the inability of either H.B. or A.M.K. to safely parent the child, the Division changed the case goal to adoption in March 2021.

T.B.-T. began to visit with J.A.B. in July 2021. After T.B.-T. agreed to live separately from her boyfriend, who had an Adoption and Safe Families Act (AFSA) disqualifier, the Division placed J.A.B. with T.B.-T. on November 24, 2021 on the presumption that T.B.-T. would obtain licensure.

5

In February 2022, the trial judge held a permanency hearing. The case goal was changed to Kinship Legal Guardianship at T.B.-T.'s request, and the matter was moved back to the FN docket.

In April 2022, T.B.-T., her children, and J.A.B. moved out of their home and stayed with T.B.-T.'s mother, delaying the licensing process. In June 2022, the family moved in again with T.B.-T.'s boyfriend. Because of that individual's AFSA disqualifier, the Division removed J.A.B. from T.B.-T.'s care and placed her back with her former resource parents. The child remained in this placement through the conclusion of the trial court proceedings.

The Division provided T.B.-T. with ongoing visits with J.A.B. At the time of trial, T.B.-T. had obtained her own housing and was being re-evaluated as a placement for J.A.B.. Both the resource parents and T.B.-T. wish to adopt J.A.B. The Division's permanency plan was for J.A.B. to be adopted by T.B.-T. if she were able to obtain licensing approval, or by the resource family.[3]

Simultaneously, the Division was still attempting to work with both H.B. and A.M.K. to get them psychological evaluations and other necessary services. H.B. attended a psychological evaluation with Dr. Alan Lee while in prison. Dr.

---

[3] T.B.-T. was no longer interested in Kinship Legal Guardianship.

A-2814-22

Lee found that H.B. lacked empathy and regard towards others, and opined that H.B. could not act as an independent caretaker of J.A.B.

By late August 2022, J.A.B. had been in Division custody for approximately thirty months. The Division changed the permanency goal to adoption, and an initial hearing was held on November 4, 2022. H.B. was present via Zoom from prison for the hearing, and successfully applied for a public defender to represent him. While in prison, H.B. underwent a psychological examination by Dr. James Loving, a licensed psychologist with an expertise in clinical and forensic psychology.[4] The guardianship trial was scheduled to start on March 28, 2023.

At the beginning of a hearing on March 28, 2023, H.B.'s attorney advised the trial judge that "[a]t the appropriate time, Your Honor, I believe [H.B.] may have an application."[5] After taking the appearances of all counsel, H.B.'s attorney stated, "Your Honor, I believe [H.B.] does wish to address the [c]ourt and I believe he may be thinking to no longer have my services as his attorney any longer." The attorney continued, "He can, I guess speak to that, Your

---

[4] We discuss Dr. Loving's findings below.

[5] H.B. had been transported to the court that day by prison authorities.

Honor, but I believe he may wish to no longer have a public defender assigned to him."

The trial judge swore H.B. in and asked him, "Is there something you would like to advise the [c]ourt?" H.B. replied "It's frivolous for me to be here. I'm the only one here. She's not doing nothing. Last time we was in court y'all didn't even let me speak." However, H.B. never asked to represent himself or for his counsel to be relieved. Instead, he asked that he not be required to attend the hearing. H.B. stated that he would be released from prison soon and that he "would like to leave as soon as possible and all of this will get handled from the street."

The judge patiently reviewed the long history of the case with H.B., who proceeded to continually interrupt her. H.B. told the judge she was "spiteful," "prejudice," [sic] and "racist." The judge continued to explain why the case needed to move forward because J.A.B. "cannot wait any longer. It's important that she has a roadmap for her permanency and stability." H.B.'s diatribe ended.

The Law Guardian then made an application to have the judge conduct a hearing to determine whether it would be in J.A.B.'s best interest to be placed with T.B.-T. or remain with her current resource home. H.B.'s attorney strongly opposed this request on his behalf, as did the Division and A.M.K. H.B.'s

attorney argued that it was premature for the trial judge to attempt to determine which possible caregiver should be granted adoption because T.B.-T.'s home was not yet licensed.

Over H.B.'s attorney's objections, the judge granted the request for the hearing, reasoning that one benefit of holding the hearing during the guardianship litigation was that H.B. and A.M.K. could participate and have counsel advise them, which would not occur if their parental rights were first terminated.

The judge conducted this hearing on April 19 and 20, 2023. During the first day of the hearing, H.B. had several angry outbursts. He repeatedly told the resource mother that he knew her address. He also continually interrupted the proceedings, first to demand that the guardianship trial, which had long been scheduled to begin on April 25, 2023, be delayed for three weeks to coincide with his alleged release date, and then to demand that he be excused from appearing in court and attending any future proceedings, including the guardianship trial. He stated he was making this request "as a strategic move because it helps me."

The judge denied his adjournment request, noting that J.A.B. had been in the Division's custody her entire life and that any delay of J.A.B.'s permanency

would only cause her further harm. Additionally, there was no way to confirm H.B.'s release date because he refused to permit the release of his parole records to the Division, and had previously told the judge different dates and timelines for his possible release.

As to H.B.'s request to stop coming to court, the judge engaged in a lengthy colloquy designed to ensure that he understood the ramifications of his request. H.B. interrupted the judge constantly during this discussion. The judge told H.B. that appearing in court was "the only way that you can participate in that trial, which is the last piece of this case before this [c]ourt, for whatever happens - - and it may be a good result for you." H.B. responded:

> I promise all y'all individually. I promise, it's going to be a great result regardless.
>
> I don't care what none of y'all say. I don't care what none of y'all say. You're not taking my daughter. You can't terminate my rights.
>
> The bitch who sit up there barren that can't have no kids, her parental rights is terminated. I can make kids.
>
> You don't believe me? Anybody want to find out? I can make kids.
>
> My rights will never be terminated. You can't do that.

Despite H.B.'s extremely disrespectful behavior, the judge continued to tell him how important it was for him to attend court. She offered to have H.B.

A-2814-22

attend via Zoom from the courtroom next door, or to return to prison and attend via Zoom there. H.B. declined these alternatives. H.B. acknowledged that his attorney would be present at all future proceedings to represent him. Satisfied that he was fully aware of the ramifications of his decision, the judge granted H.B.'s request to absent himself from any further court proceedings.

After H.B. left the court, the judge heard testimony from the resource mother, T.B.-T., Division workers, and the Law Guardian's expert, Dr. Roberta Dihoff, who had conducted a bonding evaluation with J.A.B., T.B.-T. and the resource family. The resource mother remained committed to adopting J.A.B. T.B.-T. testified that she wished to proceed with licensing with the goal of adopting J.A.B. The Division's preference at that time was for J.A.B. to return to T.B.-T.'s care if she were able to become licensed. Dr. Dihoff testified that it would be in J.A.B.'s best interest to achieve permanency as quickly as possible.

At the conclusion of the hearing, the judge stated she was "unable to make a decision of one caregiver over another, acknowledging that both the resource parents . . . and [J.A.B.]'s sister, [T.B.-T.] testified to their clear desires to adopt [J.A.B.] if she is legally free." In essence, the judge agreed with H.B., the Division, and A.M.K. that it was premature to make a permanency decision in

11

advance of a determination whether the parental rights of the parties should be terminated. The judge ordered the Division to continue the processing of T.B.-T.'s licensing application.

As scheduled, the guardianship trial was held on April 25, 2023. The Division called Dr. Loving and Division Adoption Worker Billie Jo Paugh to testify. There were no other witnesses.

Dr. Loving was qualified as an expert in clinical and forensic psychology. He testified that H.B. was only "marginally cooperative," "menacing," and "really hostile" during the evaluation he conducted with H.B. in March 2023.

Dr. Loving observed that H.B. had "no inkling of personal responsibility" in regard to the current situation with J.A.B. H.B. told Dr. Loving that the only barrier to reunification with his daughter was "the system."

Dr. Loving diagnosed H.B. with anti-social personality disorder with narcissistic traits. He opined that "[H.B.] is perpetually getting into trouble . . . not being able to control himself" with "an attitude here that he's right and other people are wrong and he's going to keep doing what he feels justified to do." Dr. Loving also diagnosed H.B. with impulse and control disorder, which would require him to engage in "real work" to make changes in his condition. However, Dr. Loving explained, "it's practically impossible to envision [H.B.]

12

taking those steps, taking some responsibility, and then staying agreeable long enough to do that work. It is near impossible to see that happening."

Dr. Loving identified "severe" risks to J.A.B. if she were reunified with H.B., considering H.B.'s history of anger problems, domestic violence with A.M.K., and high risk of recidivism. He explained, "it's frightening to envision what [H.B.] would be capable of if he were unsupervised with [J.A.B.] at this point, if he were to become angry at her or angry at people around her." Finding that H.B.'s prognosis was "extremely poor," Dr. Loving supported the Division's goal of adoption for J.A.B.

During her testimony, Paugh reviewed the Division's involvement with the family since J.A.B.'s birth in December 2019. Paugh stated that H.B. was resistant to completing services before and during his incarceration. She also described the difficulty in working with H.B., given his hostile behavior towards Division workers and service providers, and unwillingness to participate in services while incarcerated, despite their availability.

At the conclusion of the trial, the judge applied the statutory "best interests of the child" standard, which authorizes the Division to initiate a petition to terminate parental rights if:

(1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;

(2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm;

(3) The division has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

[N.J.S.A. 30:4C-15.1(a).]

In her comprehensive oral decision, the judge concluded that the Division had satisfied each of the four prongs of N.J.S.A. 30:4C-15.1(a) by clear and convincing evidence. As to prongs one and two of the statutory test, the judge found that H.B.'s and A.M.K.'s parental rights should be terminated due to their irresponsibility and non-compliance with offered services. They were simply not able to adequately provide a safe and healthy environment for J.A.B. The judge cited H.B.'s heightened risk of recidivism, interpersonal conflicts, his persistent belief that none of this was his fault, despite evidence to the contrary,

and "most importantly, [Dr. Loving]'s uncontroverted opinion that . . . he could not recommend [J.A.B] be placed with [H.B.]."

The judge found that the Division made reasonable efforts to arrange visits and services for H.B., but he did not remediate the problems that caused the removal. The judge pointed to "the harm of [H.B.'s] anger issues, hostility, behavioral issues, potential . . . failure to have visited consistently and establish a relationship with [J.A.B.] for that one year before he was incarcerated" as further support for her findings under the first two prongs.

Under the third prong, the judge reiterated that services had been offered to H.B. throughout the litigation, and he was kept informed of the case status. However, H.B. refused to take advantage of services both before and during his incarceration. The judge found no alternatives to adoption as neither T.B.-T. nor the resource parents were seeking Kinship Legal Guardianship.

Finally, as to prong four, the trial judge found that termination was clearly in J.A.B.'s best interests as she could not safely live with either parent now or in the foreseeable future. She had never lived with her parents in her three years

15

of life.  Further, she had two viable options for adoption once she was given the opportunity for permanency.  This appeal followed.[6]

## II.

The scope of our review of a trial court's decision to terminate parental rights is limited.  N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 448-49 (2012).  "Because of the family courts' special jurisdiction and expertise in family matters," we accord deference to the trial court's fact-finding and the conclusions that flow logically from those findings of fact.  Cesare v. Cesare, 154 N.J. 394, 413 (l998).  We are bound by those factual findings so long as they are supported by sufficient credible evidence.  N.J. Div. of Youth  & Fam. Servs. v. M.M., 189 N.J. 261, 279 (2007).

The trial judge's opinion tracks the requirements of N.J.S.A. 30:4C-15.1(a), and is supported by substantial and credible evidence in the record.  F.M., 211 N.J. at 448-49.  After appraising the record in light of the findings of fact contained in the judge's decision, we find nothing that requires our

---

[6]  During the pendency of the appeal, defendant submitted a certification elaborating upon his relationship with his trial attorney.  We granted defendant's motion to supplement the record with this certification and have considered it in our determination of this appeal.

A-2814-22

intervention. The judge carefully reviewed the relevant evidence and fully explained her reasons in a logical and forthright fashion.

H.B.'s argument concerning the statutory test on appeal is limited to his contention that the trial judge erred when she concluded that the Division satisfied the fourth statutory prong, which requires the court to determine whether termination of parental rights will not do more harm than good to the child. N.J.S.A. 30:4C-15.1(a)(4). We disagree.

N.J.S.A. 30:4C-15.1(a)(4) "serves as a fail-safe against termination even where the remaining standards have been met." Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 609 (2007). The question is "whether a child's interest will best be served by completely terminating the child's relationship with that parent." N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 108 (2008). The ultimate determination to be made under the fourth prong is "whether, after considering and balancing the two relationships, the child will suffer a greater harm from the termination of ties with [the] natural parents than from the permanent disruption of [the] relationship with [the] foster parents." In re Guardianship of K.H.O., 161 N.J. 337, 355 (1999).

In finding that the Division met the fourth prong, the trial judge relied on Dr. Loving's unrefuted expert testimony that it would be "frightening" to place

J.A.B. in H.B's care because of his uncontrolled anger issues. Dr. Loving opined that it was "practically impossible" to envision H.B. making the changes necessary to address his many issues. Thus, permanency with H.B. was not a viable option at the time of the trial or for the foreseeable future.

On the other hand, J.A.B. had two seemingly viable avenues of permanency with either her current resource parents or with T.B.-T. The resource parents have cared for the child for approximately three years, spanning two placements. T.B.-T. is a relative, who has also remained committed to adopting the child and to pursuing the licensing process.

Contrary to H.B.'s argument in Point III of his brief, the trial judge was properly cautious in waiting until the licensing study of T.B.-T and her home was completed before deciding on the specific permanency plan for J.A.B. Although a court could certainly place the child with T.B.-T even if the Division denied T.B.-T.'s licensing application, (see N.J. Div. of Child Prot. & Permanency v. K.N., 435 N.J. Super. 16, 29 (App. Div. 2014), aff'd as modified, 223 N.J. 530 (2015)), the study will provide essential information to the court, allowing it to make a fully informed decision on the child's placement now that the child has been freed for adoption.

The question of which placement is in the J.A.B.'s best interests is not currently before us. However, the uncontroverted evidence at trial firmly established that H.B. is unable to care for the child, and the judge correctly found that it would be in J.A.B.'s best interests to be adopted by either the resource parents or T.B.-T. Under these circumstances, there is no reason to believe that terminating H.B.'s parental rights, thus freeing J.A.B. for adoption, would do more harm than good. Therefore, the trial judge properly concluded that all of the requirements of N.J.S.A. 30:4C-15.1(a) were satisfied, including prong four of the statutory test.

### III.

H.B.'s remaining arguments lack sufficient merit to warrant extended discussion. See R. 2:11-3(e)(1)(E). We add the following brief comments.

In Point II, H.B. argues that the trial judge abused her discretion by denying his request to adjourn the long-scheduled date for the termination trial. Timeliness is important in cases concerning parental rights because of the impact a delay or interruption can have on a child awaiting permanency. N.J. Div. of Child Prot. & Permanency v. R.L.M., 236 N.J. 123, 146 (2018). Accordingly, "Family Part judges conducting termination of parental rights

proceedings must be mindful of the need for prompt determination of the difficult issues before them." Id. at 146-47.

Guided by these principles, we are satisfied that the trial judge properly weighed the timing and merits of H.B.'s adjournment request against J.A.B.'s need for permanency. We discern no error in the judge's finding that it was appropriate to commence the trial as scheduled.

Finally, in Point I, H.B. argues that the trial judge should have "inquire[d] into [his] request to relieve his counsel." Specifically, he asserts the judge was required to inquire "as to whether, after colloquy, H.B. wished to proceed pro se" or replace his attorney. We disagree.

Parents have a right to represent themselves in termination matters. R.L.M., 236 N.J. at 148-49. However, this right is not absolute; rather, the right "must be exercised in a manner that permits a full and fair adjudication of the dispute and a prompt and equitable permanency determination for the child." Id. at 132. Thus, a "parent must inform the court of his or her intention to appear pro se in a timely manner, so as to minimize delay of the proceedings." Ibid. For a request to be timely, the parent does not have to waive or invoke the right to self-representation at the inception of the litigation, but must do so "well in

advance of trial." Id. at 149. It is up to the discretion of the trial judge to accept or reject a parent's untimely request to self-represent. Ibid.

Additionally, the right to self-representation must be invoked clearly and unequivocally. Id. at 132. Once invoked, "the court should conduct an inquiry 'to ensure the parent understands the nature of the proceeding as well as the problems [he] may face if [he] chooses to represent [him]self.'" Ibid. (quoting In re Adoption of a Child by J.E.V. and D.G.V., 226 N.J. 90, 114 (2016)).

Here, H.B. never asked for the opportunity to represent himself or to replace his attorney. On March 28, 2023, his attorney advised the trial judge that H.B. may no longer want to have a public defender assigned to him. However, when the judge asked H.B. what he wanted to tell her, he complained about having to appear in court and began to insult the judge. The record reflects that the trial judge responded to H.B.'s outbursts with patience and professionalism.

While H.B. also made remarks during the proceeding concerning his own attorney, he never unequivocally stated he wished to appear on behalf of himself or replace his attorney. Instead, he relied upon his attorney to represent his interests both before and after he decided to forego any further court appearances. Therefore, we reject H.B.'s contentions on this point.

IV.

In sum, children like J.A.B. are entitled to a permanent, safe and secure home. We acknowledge "the need for permanency of placements by placing limits on the time for a birth parent to correct conditions in anticipation of reuniting with the child." N.J. Div. of Youth & Fam. Servs. v. C.S., 367 N.J. Super. 76, 111 (App. Div. 2004). As public policy increasingly focuses on a child's need for permanency, "[t]he emphasis has shifted from protracted efforts for reunification with a birth parent to an expeditious, permanent placement to promote the child's well-being." Ibid. That is because "[a] child cannot be held prisoner of the rights of others, even those of his or her parents. Children have their own rights, including the right to a permanent, safe and stable placement." Ibid.

The question then is "whether the parent can become fit in time to meet the needs of the children." N.J. Div. of Youth & Fam. Servs. v. F.M., 375 N.J. Super. 235, 263 (App. Div. 2005); see also N.J. Div. of Youth & Fam. Servs. v. P.P., 180 N.J. 494, 512 (2004). After carefully considering the evidence, the trial judge reasonably determined that H.B. was unable to parent J.A.B. and would not be able to do so for the foreseeable future. Under those

circumstances, we agree with the trial judge that any further delay of permanent placement would not be in the child's best interests.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2814-22