# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-2199-22
                A-2200-22

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

      Plaintiff-Respondent,

v.

L.T.T. and S.M.,[1]

      Defendants-Appellants.

_____

IN THE MATTER OF
THE GUARDIANSHIP R.L.A.T.,
a Minor.

_____

Argued October 28, 2024 – Decided December 2, 2024

Before Judges Sabatino, Gummer, and Berdote Byrne.

---

[1] We use initials and fictitious names from the briefs in our opinion to protect the parties' privacy and because records relating to proceedings held under Rule 5:12 are excluded from public access under Rule 1:38-3(d)(12).

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Mercer County, Docket No. FG-11-0008-20.

Ryan Thomas Clark, Designated Counsel, argued the cause for appellant L.T.T. (Jennifer Nicole Sellitti, Public Defender, attorney; Ryan Thomas Clark, on the briefs).

Rebekah E. Heilman, Designated Counsel, argued the cause for appellant S.M. (Jennifer Nicole Sellitti, Public Defender, attorney; Rebekah E. Heilman, on the briefs).

Jessica A. Prentice, Deputy Attorney General, argued the cause for respondent Division of Child Protection and Permanency (Matthew J. Platkin, Attorney General of New Jersey, attorney; Sookie Bae, Assistant Attorney General, of counsel; Jessica A. Prentice, on the brief).

Cory H. Cassar, Designated Counsel, argued the cause for minor R.L.A.T. (Jennifer Nicole Sellitti, Public Defender, Law Guardian, attorney; Meredith Alexis Pollock, Deputy Public Defender, of counsel; Cory H. Cassar, on the brief).

PER CURIAM

In these consolidated appeals, defendant L.T.T., the biological mother of minor R.L.A.T., and defendant S.M., the minor's biological father, seek reversal of the final judgment of guardianship the Family Part entered on March 3, 2023, in favor of the Division of Child Protection and Permanency. The judgment

A-2199-22

terminated defendants' respective parental rights after a lengthy trial. The Law Guardian for the minor joins with the Division in opposing the appeals.

For the reasons that follow, we affirm the merits of the decision to terminate defendants' rights and enable the adoption of the child by his resource parent, substantially for the reasons the trial court detailed in its 119-page written opinion. The court reasonably determined the Division had met its burden of proving, by clear and convincing evidence, all four prongs of the statutory criteria for termination under N.J.S.A. 30:4C-15.1(a). In addition, we reject defendants' arguments to set aside the judgment because of alleged conflicts of interest and other claimed infirmities.

I.

Given that the parties are well familiar with the extensive factual and procedural background of this matter, and the record of the eight-day trial, we need not detail that background in this opinion. The following abbreviated summary will suffice.

R.L.A.T. ("Ron"), the minor who is the focus of this case, was born in October 2016. He is presently eight years old.

Defendants L.T.T. ("the mother") and S.M. ("the father") are separated co-parents who never married one another. The mother has two older children,

and the father has seven other children, none of whom reside with them. The mother did not identify a father on Ron's birth certificate and initially raised Ron independently but later advised the Division that she believed S.M. is Ron's father.

The Division removed Ron and his older sister from the mother's residence in September 2017, after the sister was observed at school with black eyes and an investigation revealed the mother had struck her. Ron was eleven months old at the time of his removal. He has not lived with the mother in the ensuing seven years. He has never lived with the father.

Ron has been placed in five different resource homes. For over four years leading up to the trial in 2022 and beyond that through today, he has lived with "Ms. B.," a resource parent. The resource parent wishes to adopt Ron. After exploring kinship legal guardianship ("KLG") through multiple conversations with the caseworker, Ms. B. is not willing to enter into a KLG arrangement with either defendant.

It is undisputed that Ron has numerous special needs, including epilepsy, developmental delays, ADHD, and bladder control difficulties. In light of Ron's special needs, the Division's testifying caseworker and its psychological expert

4

testified that Ms. B. is fully equipped to handle Ron's needs and has bonded with Ron.

The mother has a host of obstacles that have prevented her from becoming a fit parent. She has anger management issues, which the judge observed first-hand during her outbursts at trial. In February 2018, the mother deliberately set a fire in her apartment by placing a rug on the stove, stating that she "lost it" when her family "got on her nerves" and "would not leave." She spent nine days in jail, eventually pleading guilty to the fourth-degree criminal offense of recklessly causing "widespread injury or damage" in violation of N.J.S.A. 2C:17-2(c). The mother was sentenced to two years of probation, subject to various conditions. The fire incident caused the mother to be evicted from her apartment. She also lost her employment and was discharged from the Division programs she had begun and had to re-enroll in them at a later time.

The record documents that the mother has long-standing substance abuse issues. She has been diagnosed with cannabis use disorder and has repeatedly tested positive for cannabis. She also has been diagnosed with multiple mood disorders and other mental health conditions. She failed to complete several drug treatment programs and mental health programs offered by the Division

5

before the trial.[2] For example, in January 2020, she was discharged from a drug treatment facility after she had threatened several employees who worked there. She has not maintained stable and suitable housing or employment. As of the time of the trial in 2022, the mother was living in a one-bedroom senior housing apartment with her own mother.

As the trial court acknowledged, the mother has attempted to maintain a relationship with Ron and has participated in over seventy-five supervised visits with him, as arranged by the Division and with the cooperation of Ms. B. However, the record also reflects the mother has missed over fifty such visits, a disappointment that can be especially impactful for a child such as Ron with special needs.

The sole testifying expert opined that the mother was not capable of taking custody of Ron as of the time of trial. Additionally, Ron's maternal grandmother was ruled out by the Division as a potential caregiver due to poor health.

The trial record as to Ron's father also raised many concerns. After the mother eventually identified him as Ron's other parent, the father appeared remotely in a court hearing in January 2018 and was informed that the Division

---

[2] Apparently, the mother completed a drug treatment program during the trial, but that belated evidence was not admitted by the trial court for the purposes of the termination hearing.

A-2199-22

had taken custody of Ron. However, the father did not immediately acknowledge his paternity. He missed three scheduled paternity tests in October 2018, November 2018, and February 2020. It was not until August 2020 that a DNA test of S.M.'s mother established his paternity. Although the father had some incidental contact with Ron by telephone or by video, he did not provide Ron with any caretaking or financial support. The last time the father spoke with Ron before the trial was in October 2021. Meanwhile, the Division investigated whether S.M.'s mother, Ron's paternal grandmother, could be a suitable caretaker and ruled her out because of her paramour's criminal history.

The witnesses for the Division at trial were its primary caseworker, her supervisor, the resource parent Ms. B., and its psychological and bonding expert. The expert described the multiple mental health and parental fitness evaluations she had performed. She explained why she did not believe Ron's mother was fit to parent Ron, why Ms. B. was a capable caregiver who had bonded with Ron, and why terminating parental rights would not cause more harm than good.[3]

---

[3] A bonding evaluation was not scheduled for S.M. and Ron due to S.M.'s avoidance of participation in the case.

A-2199-22

The parents each testified on their own behalf and did not call any opposing experts or witnesses. The Law Guardian joined with the Division in supporting termination, but did not call any witnesses.

After reviewing the testimony and other evidence, the trial judge concluded the Division had met its burden of proof as to each of the four statutory factors. The present appeals ensued.

## II.

### A.

The applicable law is clear. The termination of parents' rights to raise their children is a matter of constitutional magnitude. See In re Guardianship of K.H.O., 161 N.J. 337, 346 (1999). Those rights, however, are "not absolute" and are limited "by the State's parens patriae responsibility to protect children whose vulnerable lives or psychological well-being may have been harmed or may be seriously endangered by a neglectful or abusive parent." N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 447 (2012).

In guardianship and adoption cases, such as here, it is well-established that "[c]hildren have their own rights, including the right to a permanent, safe[,] and stable placement." N.J. Div. of Youth & Fam. Servs. v. C.S., 367 N.J. Super. 76, 111 (App. Div. 2004). Our courts have acknowledged "the need for

8

permanency of placements by placing limits on the time for a birth parent to correct conditions in anticipation of reuniting with the child." Ibid. Thus, a parent's interest must, at times, yield to the State's obligation to protect children from harm. See N.J. Div. of Youth & Fam. Servs. v. G.M., 198 N.J. 382, 397 (2009).

When seeking termination of parental rights under N.J.S.A. 30:4C-15.1(a), the Division must establish, by clear and convincing evidence, the following four-prong criteria, as amended by the Legislature in 2021:

> (1) The child's safety, health or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm;
>
> (3) [The Division] has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and
>
> (4) Termination of parental rights will not do more harm than good.

These four prongs are "not discrete and separate" but rather "overlap to offer a full picture of the child's best interest." N.J. Div. of Youth & Fam. Servs. v. R.G., 217 N.J. 527, 554 (2014).

As elaborated in the trial court's comprehensive opinion, we agree there is "adequate, substantial, and credible evidence" to support its decision to terminate parental rights. N.J. Div. of Child. Prot. & Permanency v. D.C.A., 256 N.J. 4, 19 (2023).

We give substantial deference to the trial court's opportunity to have observed the witnesses first-hand and to evaluate their credibility. R.G., 217 N.J. at 552. The trial court's decision should be reversed on appeal only if its findings were "so wholly unsupportable as to result in a denial of justice." N.J. Div. of Youth & Fam. Servs. v. P.P., 180 N.J. 494, 511 (2004). That said, we acknowledge appellate review of the trial court's legal interpretations is de novo. R.G., 217 N.J. at 552–53.

The trial court's extensive written opinion thoroughly addressed all four statutory factors for termination and need not be repeated in detail here. Both parents have shown themselves under prong one to be unfit to care for Ron: (1) the mother primarily due to her persisting substance abuse and anger management issues, lack of compliance with Division services, and lack of

10

suitable or stable housing; and (2) the father primarily due to his protracted failures to acknowledge paternity and, once paternity was confirmed through his mother's DNA, to cultivate a supportive relationship with his son.

Under prong two, the court reasonably found, largely based on the unrebutted testimony of the Division's expert and the testimony of the caseworker, that defendants are unlikely to remediate the factors posing a risk of harm to Ron in the foreseeable future.

As to prong three, the record supports the court's findings that the Division reasonably provided or offered defendants many services. In that regard, we reject the father's arguments that the Division unnecessarily required testing to establish his paternity, as he and his counsel on multiple occasions before trial insisted on such testing. The father did not provide a Certificate of Parentage pursuant to N.J.S.A. 9:17-41(b), nor did he seek to amend Ron's birth certificate.

Moreover, the court had an ample basis under prong three to find the Division had adequately explored alternatives to termination. The Division duly considered and ruled out both the paternal and maternal grandmothers for logical reasons. And KLG was not an option acceptable to the resource parent, who has been raising Ron for the past six years and wishes to adopt him.

Lastly, as to the fourth prong, the trial court did not abuse its discretion in

adopting the unrebutted expert's opinion that termination would not cause this child more harm than good. Although defendants identified concerns about Ms. B.'s parenting skills, the court reasonably accepted the testimony of the Division's witnesses that, on the whole, she has been a competent caregiver for most of Ron's life and the two of them have bonded. The court took into account the mother's numerous visits with Ron (along with the many she missed) and fairly concluded that, despite those efforts, her persisting substance use, mental health instability, and lack of stable housing or employment weighed against prolonging the efforts at reunification. As for the father, the court accounted for S.M.'s "complete and total absence and lack of involvement in [Ron]'s life" and found terminating his rights will not do more harm than good.

The court did not err in giving substantial weight to Ron's need for permanency, having been in an uncertain status since his removal in 2017. N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 281 (2007).

In sum, we affirm the trial court's decision on the merits, substantially for the sound reasons stated at length in the court's lengthy written opinion.

B.

Apart from their arguments about the merits, defendants have presented several contentions of conflicts of interest and infirmities that they contend taint

the final judgment and require it to be set aside. We briefly address those contentions, concluding that none of them rise to a level that requires a new trial.

Defendants contend the Law Guardian had a conflict of interest that disqualified her from participating in the case. They base the claim of conflict on the fact she had served as a law clerk for a different Family Part judge in the 2018 to 2019 court term in the same vicinage and that in 2019 the previous judge had the "FN" abuse and neglect case on his docket. When the trial judge was informed of the Law Guardian's previous clerkship service, he considered attorney certifications and oral argument about the alleged conflict. The Law Guardian represented to the court that she had no substantial involvement with "FN" or "FG" cases on the judge's docket during her clerkship and had never worked on previous cases filed against this family. Based on that representation of non-involvement, the trial judge concluded the attorney had no disqualifying conflict. The judge's decision comports with RPC 1.12(a), which prohibits representation by a former judicial law clerk only if the present matter is one in which the lawyer "participated personally and substantially" as a law clerk. There is no evidence of that here.

Another alleged conflict of interest raised by defendants stems from the fact that the Division's primary caseworker in this matter has a great aunt who

is married to the pastor of Ron's maternal grandmother's church and that the caseworker's great aunt is a close friend of Ron's maternal grandmother. This relationship became known to the caseworker at a pretrial court proceeding in February 2022, when the caseworker saw her great aunt accompanying the maternal grandmother in the courtroom as an observer. The caseworker brought this discovery to the attention of her supervisor in the Division, and it was deemed to be an insufficient relationship to warrant removing the caseworker from this matter. When this alleged conflict was presented to the court during the midst of the trial, the judge heard testimony from both the supervisor and the caseworker. The caseworker attested that she did not have a close relationship with her great aunt, and her supervisor explained why the Division accordingly did not remove her from the case. Given that testimony, the trial judge concluded the relationship was too attenuated to require the caseworker's disqualification under the Conflicts of Interest Law for state employees, N.J.S.A. 52:13D-12 to -28. We concur.

The circumstances here are not comparable to those in New Jersey Division of Child Protection & Permanency v. T.S., 463 N.J. Super. 142 (App. Div. 2020). In T.S., we remanded for a plenary hearing a claim of a conflict of interest, in a situation in which a resource parent who was seeking to adopt a

defendant's child in the Division's custody also happened to be a domestic violence liaison in the same Division as the caseworker managing the case. Id. at 162. Here, there is no such apparent conflict or bias arising from the caseworker's attenuated familial nexus to her great aunt and uncle. A reasonable informed citizen would not likely conclude that defendants would be prejudiced by the caseworker's great aunt accompanying defendant L.T.T.'s own mother to a court session as a supportive friend. There is no evidence that the caseworker ever discussed the case with her great aunt or uncle or that the relationship would cause her to be compromised. We further note that the State Ethics Code, N.J.A.C. 19:61-7.3, defines a "relative" who may trigger a need for a state employee's disqualification with nearly twenty categories of familial relationships but does not include a great aunt or great uncle within that listing.[4]

Defendants additionally contend the trial court must have been biased because it allowed the Law Guardian to "operate" the CourtSmart recording

---

[4] N.J.A.C. 19:61-7.3 provides that:

> "Relative" means a spouse, civil union partner or domestic partner, parent, child, sibling, grandparent, grandchild, uncle, aunt, nephew, niece, father-in-law, mother-in-law, daughter-in-law, son-in-law, brother-in-law, sister-in-law, or first cousin, whether in whole or half blood, by marriage, adoption or natural relationship, and the spouse of any such person.

system on several occasions when the court employee who would normally operate the system was absent from work. In this regard, defendants cite to the Code of Conduct for judicial employees requiring court staff assigned to the courtroom to carry out their duties impartially and to avoid the appearance of impropriety. There is no evidence before us that the Law Guardian did anything more than turn the CourtSmart equipment "on" when the proceeding began and "off" when it ended. There is no indication the Law Guardian logged or "tagged" who was speaking at any point in the proceeding, as would have been the court staff's responsibility. In hindsight, the trial court should not have allowed the Law Guardian to touch the CourtSmart equipment at all, even out of expediency, and should instead have either delayed the proceeding to obtain a backup staff member or cancelled the trial for that day. Nevertheless, despite that improvident decision, we are unpersuaded the switch-on/switch-off involvement of the Law Guardian deprived defendants of a fair trial.

The last topic of alleged impropriety raised by defendants stems from two sets of conversations that took place in the courtroom during recesses that were audio recorded on CourtSmart, and later transcribed. In the first incident, the caseworker, the Law Guardian, and the Division's counsel were in the courtroom without counsel for either parent being present. Before that recess, the

16

caseworker was in the midst of testifying on cross examination by L.T.T.'s counsel. In the CourtSmart transcript, the attorneys for the Division and the Law Guardian have a short exchange with the caseworker, telling her she needed to "clear up" and "clarify" whether she was related to L.T.T. or Ron's grandmother. The caseworker responded she was not related to them. She resumed her testimony the next trial day.

Defense counsel argued the opposing lawyers' off-the-record conversation with the caseworker, who had not yet finished her testimony, was inappropriate and constituted improper witness coaching. However, the applicable case law and analogous Court Rule do not clearly compel that inference. Rule 4:14-3(f), which governs consultations with a witness at a deposition, prescribes that once a witness has been sworn, there "shall be no communication between the deponent and counsel . . . while testimony is being taken except with regard to the assertion of a claim of privilege, a right to confidentiality, or a limitation pursuant to a previously entered court order." However, a published comment to the Rule notes that it addresses only conversations while a deposition is being taken, and "clearly does not address consultation during overnight, lunch and other breaks." Pressler & Verniero, N.J. Ct. Rules, cmt. on R. 4:14-3(f) (2025).

In the case of In re PSE & G Shareholder Litigation, the court outlined

17

restrictions that should apply to the depositions of defendant directors that extended to breaks but not to overnights: "[O]nce the deposition commences there should be no discussion between council and the witness, <u>even during recesses</u> . . . until the deposition concludes that day. However, at the conclusion of the daily deposition, counsel and the witness should be permitted to confer and prepare for the next day's deposition." 320 N.J. Super. 112, 117–18 (Ch. Div. 1998) (emphasis added). The court further stated that it "does not believe that blanket restrictions should be imposed in every case. Each case must be dealt with on the basis of the individual facts presented to the court." <u>Id.</u> at 117.

Here, the record shows that the court had all but concluded for the day when the conversation with the caseworker and the two attorneys took place during a recess. As the court had not formally adjourned for the day, <u>In re PSE & G</u> instructs we must look to the facts presented. <u>Ibid.</u> Here, the tenor of the discussion is not plainly indicative of improper coaching. The attorneys appear to have been urging the caseworker to disclose any familial connections that might have disqualified her on conflict grounds—a topic that was of interest to all parties. We are unpersuaded this discussion requires the judgment to be set aside and this child's status placed in further uncertainty. As we noted above, the friendship between the caseworker's great aunt and Ron's maternal

grandmother was too attenuated to be consequential.

More concerning, however, is a second conversation that occurred in the courtroom during a recess, in which disparaging comments were made about the father's trial attorney and which was likewise recorded on CourtSmart. The discussion began when the caseworker and a sheriff's officer were apparently alone in the courtroom and the caseworker complained about what she perceived to be the "last minute" actions of the father's attorney. The transcript suggests that the Law Guardian then entered the room and joined the discussion, referring to the father's attorney with pejorative language we need not repeat here. The Law Guardian then left the room, and the caseworker observed that the two adversaries "push each other's buttons way too much."

Defendants argue that this conversation evidences a lack of professionalism and a bias against the father's trial attorney that requires redress. After the merits briefs in this appeal were filed, the trial judge submitted a letter of amplification stating that he was not present in the courtroom, nor within earshot, when this off-the-record conversation occurred. Counsel for the parties submitted supplemental briefs addressing the amplification.

We must stress that the disparaging remarks made by counsel about an opposing attorney, even recognizing the pressures of a lengthy trial and a long

19

court day, are unacceptable. Undoubtedly, the manner in which an opponent tries a case and advocates her own client's interests sometimes can be a source of frustration. But counsel must always strive to observe the high standards of courtesy and respect our profession aspires to maintain. That said, while we disapprove of these particular disparaging remarks, we are not persuaded they require the judgment to be reversed and a new trial conducted. The clear and convincing evidence of the statutory factors is not altered by this behavior. We hope and trust that our disapproval of this unfortunate experience will incentivize attorneys to refrain from similar name-calling in the future.

To the extent we have not addressed them explicitly, all other arguments raised by either defendant lack sufficient merit to discuss in this opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2199-22